855 F.2d 1454
 129 L.R.R.M. (BNA) 2256, 57 USLW 2196
 IMMIGRATION & NATURALIZATION SERVICE, Petitioner,
v.
FEDERAL LABOR RELATIONS AUTHORITY, Respondent.
IMMIGRATION & NATURALIZATION SERVICE, Petitioner,
v.
FEDERAL LABOR RELATIONS AUTHORITY, Respondent,
and
American Federation of Government Employees, AFL-CIO,
Respondent-Intervenor.
FEDERAL LABOR RELATIONS AUTHORITY, Petitioner,
v.
IMMIGRATION & NATURALIZATION SERVICE, Respondent.
FEDERAL LABOR RELATIONS AUTHORITY, Petitioner,
v.
IMMIGRATION & NATURALIZATION SERVICE, Respondent.
 Nos. 87-7138, 87-7146, 87-7208 and 87-7209.
 United States Court of Appeals,
Ninth Circuit.
 Argued Dec. 8, 1987.
Submission Withdrawn Dec. 10, 1987.
Resubmitted Jan. 7, 1988.
Decided Sept. 1, 1988.
 
 Dwight A. Rabuse, Appellate Staff, Civil Div., Dept. of Justice, Washington, D.C., for petitioner-cross-respondent.
 Arthur A. Horowitz, Associate Solicitor, Federal Labor Relations Authority, Washington, D.C., for respondent-cross-petitioner.
 Judith D. Galat, American Federation of Government Employees, Washington, D.C., for respondent-intervenor.
 On Petitions for Review and Cross-Applications for Enforcement of Orders of the Federal Labor Relations Authority.
 Before WALLACE, NORRIS and THOMPSON, Circuit Judges.
 WALLACE, Circuit Judge:
 
 
 1
 The Immigration and Naturalization Service (INS) seeks review of two separate decisions of the Federal Labor Relations Authority (Authority) arising under the Federal Service Labor-Management Relations Act (Act), 5 U.S.C. Secs. 7101-7135. In each case the Authority concluded that the INS had committed an unfair labor practice by prohibiting uniformed INS inspectors from wearing union insignia on their uniforms while on duty at the San Ysidro Port of Entry. The INS filed timely petitions for review in both cases and the Authority timely moved for enforcement in both cases. We consolidated the cases on appeal.
 
 
 2
 The Authority had jurisdiction pursuant to 5 U.S.C. Sec. 7105(a)(2)(G). We have jurisdiction pursuant to 5 U.S.C. Sec. 7123(a). We deny enforcement of both orders.
 
 
 3
 * The INS employs approximately fifty immigration inspectors at the San Ysidro Port of Entry. The immigration inspectors are law enforcement officers responsible for enforcing federal immigration and customs laws. They inspect both persons and vehicles entering the Port for contraband and ensure that foreign entrants possess proper passports, visas, or other entry documents. Obviously, their work requires frequent contact with the public.
 
 
 4
 Inspectors at the San Ysidro Port of Entry work under the management of a number of INS officials, including a Port Director, Assistant Port Director, three operations supervisors, and eight "first-line" supervisors. All of these supervisors are responsible for, among other things, ensuring that the inspectors wear proper uniforms while on duty.
 
 
 5
 The INS requires that the inspectors wear official INS uniforms. Section 2415.01 of the INS Administrative Manual and Officers' Handbook (manual) prescribes the official uniform: a light blue shirt, bearing the INS insignia on the sleeve, dark blue pants, black shoes, black socks, a belt, a tie, and a tie tack. In the summer, the uniform includes a short-sleeve light blue shirt and does not include a tie. Section 2415.01 does not prescribe the design of the tie tack or the belt buckle. The manual also requires that the inspectors wear an INS badge on the left shirt breast pocket and an official name plate on the right shirt breast pocket and that the uniform "be complete in all details and devoid of all ornaments which are not part of the uniform."
 
 
 6
 Despite this regulation, at various times some inspectors wore assorted adornments on their official uniforms. In 1984, just prior to the Olympics, the INS issued and authorized the inspectors to wear a button approximately two inches in diameter which stated "WE SERVE with Courtesy and Pride, I.N.S." Certain inspectors also wore small olympic torch pins on their uniforms without any objection. In 1984, the INS issued and authorized certain inspectors to wear a pin 1/2 inch in diameter stating the inspector's length of service. One inspector also testified that during the 1984 National League Championship Series and the World Series, he wore a button 2 1/4 inches in diameter depicting a cartoon character swinging a bat and advertising the San Diego Padres.
 
 
 7
 Between May and August of 1985, Inspector Stark wore on his right uniform breast pocket a shield-shaped red, white, and blue union pin which contained the initials "A.F.G.E., AFL-CIO," which identified the American Federation of Government Employees, AFL-CIO (Union). Although none of Stark's first-line supervisors challenged Stark for wearing the pin, in August 1985 the Port Director directed him to remove the pin, and he complied.
 
 
 8
 Between mid-1983 and May 1985, Walker worked part-time as an inspector. When doing so, he wore an off-white plastic penholder and pocket protector on his right uniform shirt pocket. This penholder fit inside his uniform shirt pocket, but had a 2 1/2 inch by 3 1/2 inch flap which folded over the outside of his shirt pocket. This flap contained a red and blue Union logo. Under the logo, the flap contained the inscription "TO DO FOR ALL THAT WHICH NONE CAN DO FOR HIMSELF."
 
 
 9
 In early 1985, Supervisor Rich asked Walker whether he would remove the penholder if asked to do so. Walker responded that he would not and that he would consider such a request to be an unfair labor practice. On May 22, 1985, Rich ordered Walker to remove the penholder on the grounds that it was not part of the official uniform. Walker complied.
 
 
 10
 At the times their supervisors ordered Stark and Walker to remove the Union insignia from their official uniforms, no organizing effort, collective bargaining, or other concerted union activity was taking place at the San Ysidro Port.
 
 
 11
 On May 31, 1985, Local 2805 of the Union filed unfair labor practice charges alleging that the INS violated 5 U.S.C. Sec. 7116(a)(1) and (5)[1] when it ordered Walker to remove the penholder. On August 28, 1985, the Authority General Counsel issued a complaint and notice of a hearing. Following briefing, the administrative law judge (ALJ) concluded that the INS had committed an unfair labor practice. The ALJ analyzed 5 U.S.C. Sec. 7102 and Sec. 7106, balanced Walker's rights against those of the INS, and concluded that Walker's interest in wearing the penholder outweighed the INS's interest in enforcing the uniform regulation. The ALJ's recommended order specified that the INS permit Walker to wear the penholder while on duty. The Authority adopted the ALJ's findings and conclusions with insignificant modifications.
 
 
 12
 On September 4, 1985, Local 2805 filed unfair labor practice charges against the INS alleging that the INS violated section 7116(a)(1) and (5) when it ordered Stark to remove his union pin. On November 29, 1985, the Authority Regional Director issued a complaint and notice against the INS. On May 20, 1986, the ALJ concluded that the INS committed an unfair labor practice when it ordered Stark to remove the pin. The ALJ reasoned that Stark had a right to wear the pin under section 7102 absent "special circumstances" because wearing the pin "assisted" the union in finding new members. The ALJ then concluded that special circumstances were not present due to the unobtrusive nature of the pin and due to the absence of a showing that the pin interfered with Stark's work. The ALJ recommended that the Authority enter an order permitting Stark to wear the pin.
 
 
 13
 The Authority adopted the ALJ's findings. The Authority recognized that the INS had the right under section 7106(b)(1) to require employees to wear uniforms; however, it also concluded that employees enjoy a general right under section 7102 to wear union insignia in the absence of "special circumstances." The Authority then concluded that because the union insignia was "small and unobtrusive," no such special circumstances existed. Thus, the Authority entered a cease and desist order that prohibited the INS from "[i]nterfering with, restraining, or coercing" Stark or any other inspector from wearing a Union lapel pin or similar insignia on their uniforms while on duty.
 
 II
 
 14
 Section 7123(c) provides that judicial review of Authority orders shall be on the record and in accordance with 5 U.S.C. Sec. 706. 5 U.S.C. Sec. 7123(c). Section 706(2)(a) provides that we should only set aside agency action if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. Sec. 706(2)(A); Navy Public Works Center v. FLRA, 678 F.2d 97, 99 (9th Cir.1982). The Authority's factual findings are conclusive if supported by substantial evidence on the record as a whole. 5 U.S.C. Sec. 7123(c); National Treasury Employees Union v. FLRA, 721 F.2d 1402, 1405 (D.C.Cir.1983).
 
 
 15
 The Authority's legal construction of the Act is entitled to deference if it is reasoned and supportable. American Federation of Government Employees, Local 2986 v. FLRA, 775 F.2d 1022, 1025 (9th Cir.1985) (American Federation ); National Treasury Employees Union v. FLRA, 732 F.2d 703, 705 (9th Cir.1984). However, as the Supreme Court made clear in Bureau of Alcohol, Tobacco and Firearms v. FLRA, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (Bureau of Alcohol ), courts should not allow this deferential standard "to slip into a judicial inertia which results in the unauthorized assumption by an agency of major policy decisions properly made by Congress." Id., quoting American Ship Building Co. v. NLRB, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965). Thus, while we will uphold the Authority's reasonable and supportable construction of the Act, we will not rubber-stamp the Authority's decision if it is inconsistent with the statutory mandate or if it frustrates the congressional policy underlying the statute. Id.
 
 III
 
 16
 The Authority argues that the plain language of section 7102[2] granting employees the "right to form, join, or assist any labor organization" gives the inspectors the right to wear a pin or penholder advertising the Union on their official uniforms. See Federal Aviation Administration, Spokane Tower/Approach Control, 15 F.L.R.A. 668 (1984) (Spokane Tower); United States Army Support Command, Fort Shafter, Hawaii, 3 F.L.R.A. 796 (1980) (Fort Shafter ).
 
 
 17
 The Authority contends that we should recognize and defer to the Authority's interpretation of section 7102 found in Spokane Tower and Fort Shafter. Under Spokane Tower and Fort Shafter, an employee may assist a labor organization by wearing a union emblem on his official uniform unless the employer can demonstrate special circumstances justifying a restriction on the employee's section 7102 rights.
 
 
 18
 We recognize that we should uphold the Authority's interpretation of the Act if it is reasoned and supportable. American Federation, 775 F.2d at 1025. Nonetheless, our primary concern is to effectuate congressional intent. See Bureau of Alcohol, 464 U.S. at 97, 104 S.Ct. at 444. Moreover, even when analyzing an agency's interpretation of the statute Congress intended it to administer, we are bound by existing Ninth Circuit and Supreme Court precedent. With these principles in mind, we must inquire whether the Authority's interpretation of section 7102 is "reasoned and supportable" by determining whether it is consistent with our interpretation of similar language in the National Labor Relations Act (NLRA) and congressional intent.
 
 
 19
 The INS makes three arguments. First, the INS argues that under section 7102, federal employees who work in public contact positions have no statutory right to display union insignia on their official uniforms while on duty. Second, the INS argues that even if section 7102 gives certain federal employees the right to wear such insignia, the INS's management rights under section 7106 limit that right and thereby bar Stark and Walker from wearing such insignia. Third, the INS argues that even if section 7106 does not limit the inspector's rights under sectin 7102, "special circumstances" allow it to enforce the nondiscriminatory policy against these particular unapproved uniform adornments. We examine the INS's first two arguments in turn.
 
 A.
 
 20
 The starting point for any issue concerning statutory interpretation must be the statute itself. E.g., Lewis v. United States, 445 U.S. 55, 60, 100 S.Ct. 915, 918, 63 L.Ed.2d 198 (1980) (Lewis ). The language of section 7102 provides some support for the Authority's conclusion. After all, wearing a union pin, button, or penholder would appear to assist the union to obtain members. The INS points out, however, that we are not interpreting the statute's language on a clean slate.
 
 
 21
 In NLRB v. Harrah's Club, 337 F.2d 177 (9th Cir.1964) (Harrah's Club ), we reviewed a National Labor Relations Board (Board) order that concluded that section 7 of the NLRA, 29 U.S.C. Sec. 158(a)(1), granted a casino's public contact uniformed employees a right to wear union buttons or pins, even though the wearing of the union buttons was not part of any concerted campaign to organize the employees, promote collective bargaining, or gain better working conditions. Harrah's Club, 337 F.2d at 178. Harrah's prohibited all of its employees from adding jewelry or other personal adornment to their official uniforms. Harrah's asserted that such a rule was a way to ensure that its employees presented a clean, professional image to the public.
 
 
 22
 We rejected the Board's interpretation of section 7 and concluded that section 7 does not necessarily guarantee employees a statutory right to wear union buttons. Id. at 179. In reaching this conclusion we quoted the following part of section 7:
 
 
 23
 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.
 
 
 24
 (Emphasis added.) We pointed out that "[t]he Supreme Court has held that the wearing of union buttons comes under the heading of 'other concerted activities.' " Id., citing Republic Aviation Corp. v. NLRB, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). We then concluded that the right to engage in concerted activities under section 7 does not necessarily include a statutory right to wear a union button. Rather, we held that to invoke the protections of section 7, an employee wearing a union button in such circumstances had to present evidence linking the button-wearing to a purpose protected under the act such as collective bargaining or other mutual aid or protection. Id.; see also NLRB v. Rooney, 677 F.2d 44, 47 (9th Cir.1982); Pay'N Save Corp. v. NLRB, 641 F.2d 697, 700 (9th Cir.1981) (button-wearing linked to organizing employees and thereby within section 7's rights). Finding no evidence that the employees wore the buttons to further a purpose the act protected, we held that section 7 did not guarantee the employees the right to wear the union buttons. Harrah's Club, 337 F.2d at 179.
 
 
 25
 The INS places great reliance on the fact that in Harrah's Club, we held that the source of any right to wear union buttons is the "concerted activities" language of section 7. By rejecting the employees' section 7 claim, we implicitly held that section 7's "to assist" language does not create a right to wear a union button. The INS contends that to interpret the "right to assist labor organizations" in section 7102 as granting employees a statutory right to wear union buttons would contradict our interpretation of identical language in the NLRA. Under such an interpretation, a uniformed, public contact federal union employee would have the right "to assist" his union by wearing a union button while a uniformed, public contact private sector union employee in a similar situation would not have the right "to assist" his union by wearing a union button. The INS argues that Congress did not intend to grant INS inspectors a statutory right denied to the card dealers and cocktail waitresses at Harrah's Casino. To bolster this conclusion, the INS points out that Congress directed the Authority and the courts to interpret the Act to promote governmental effectiveness and efficiency, 5 U.S.C. Sec. 7101(b), and that Congress expressly added a strong management rights section to the Act, 5 U.S.C. Sec. 7106, which is notably absent from the NLRA.
 
 
 26
 We find these arguments persuasive. We doubt that Congress intended the phrase "to assist labor organizations" to grant uniformed federal immigration inspectors a statutory right when that identical language does not provide such a right to uniformed casino employees. However, given the potentially contradictory interpretation of identical language found in the NLRA and the Act, we believe that we must examine the legislative history of section 7102 to determine whether Congress intended this result.
 
 
 27
 There is relatively little discussion of section 7102 in the Act's legislative history. Both the Senate and House Reports indicate that the employee rights section ultimately adopted as section 7102 was intended to incorporate the policy contained in section 1(a) of Executive Order 11491. See S.Rep. No. 969, 95th Cong., 1st Sess. 102 (1978), reprinted in Legislative History of the Federal Service Labor-Management Relations Statute, Title VII of the Civil Reforms Act of 1978, at 762 (1979) (hereinafter Legislative History); H.R.Rep. No. 1403, 95th Cong., 1st Sess. 38-39 (1978), reprinted in Legislative History at 684-85. Section 1(a) of Executive Order 11491 stated that:
 
 
 28
 Each employee of the executive branch of the Federal Government has the right, freely and without fear of penalty or reprisal, to form, join, and assist a labor organization or to refrain from any such activity, and each employee shall be protected in the exercise of this right. Except as otherwise expressly provided in this Order, the right to assist a labor organization extends to participation in the management of the organization and acting for the organization in the capacity of an organization representative, including presentation of its views to officials of the executive branch, the Congress, or other appropriate authority. The head of each agency shall take the action required to assure that employees in the agency are apprised of their rights under this section and that no interference, restraint, coercion, or discrimination is practiced within his agency to encourage or discourage membership in a labor organization.
 
 
 29
 Exec. Order 11491, reprinted in 5 U.S.C.A. Sec. 7101 at 5. The Supreme Court has stated that "one of the primary purposes of the Executive Order was to 'substantially strengthen the Federal labor relations system by bringing it more into line with practices in the private sector of the economy.' " Old Dominion Branch No. 496, National Association of Letter Carriers v. Austin, 418 U.S. 264, 274-75, 94 S.Ct. 2770, 2776, 41 L.Ed.2d 745 (1974) (Letter Carriers), quoting 5 Presidential Documents 1508 (Oct. 29, 1969) (announcement of the signing of Exec. Order No. 11491). The Court also offered an explanation for the difference between section 1 of the Executive Order, which does not include the right to engage in "other concerted activities," and section 7 of the NLRA, which explicitly protects "concerted activities." The Court stated that:
 
 
 30
 Section 1 of the Executive Order does not grant federal employees the right, guaranteed by Sec. 7 of the NLRA for employees in the private sector, "to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." The right to attempt to persuade others to join the union, however, is derived from the rights to form, join, and assist a union, as well as from the right to engage in concerted activities. The absence of mention of a right to engage in concerted activities is obviously no more than a reflection of the fact that the Order does not permit federal employee unions to engage in strikes or picketing. The prohibition of picketing and the lack of protection for concerted activities might be thought to indicate an intention in the Executive Order to regulate the location or form of employee speech to a somewhat greater extent than under the NLRA....
 
 
 31
 Id., 418 U.S. at 278 n. 13, 94 S.Ct. at 2778 n. 13. Thus, the Court seemed to recognize that the President, in enacting the Executive Order, intended to regulate federal employee speech to a somewhat greater extent than allowed under the NLRA. Congress in adopting the language for section 7102 from the Executive Order apparently had this same intention. Cf. Apex Hosiery Co. v. Leader, 310 U.S. 469, 487-89, 60 S.Ct. 982, 988-89, 84 L.Ed. 1311 (1940) (congressional failure to alter an Act following judicial construction indicates that the judicial construction is the correct interpretation).
 
 
 32
 The Authority argues that even if the rights guaranteed public sector employees by the Executive Order are somewhat more limited than those guaranteed by section 7 of the NLRA, we should nonetheless defer to the Federal Labor Relations Council's interpretation of the Executive Order. The Council, which administered federal labor relations under the Order, possessed the authority to interpret the Order. In Department of Transportation, FAA, Aeronautical Center and AFGE, AFL-CIO, Local Union 2282, 1 F.L.R.C. 246 (1973) (Aeronautical Center ), the Council, in a one paragraph opinion, upheld a Federal Aviation Administration academy instructor's "right" to wear a union insignia on his uniform. The Authority argues that we must defer to this decision when interpreting the scope of section 7102.
 
 
 33
 We are not persuaded that we must defer to the Council's interpretation of the Order in Aeronautical Center when determining the scope of section 7102. Congress expressly intended to allow both the Authority and the courts to disregard the Council's interpretation of the Executive Order. See 5 U.S.C. Sec. 7135(b) ("[p]olicies, regulations, and procedures established under and decisions issued under" the Executive Order remain in force "until revised or revoked by the President, or unless superseded by specific provisions of this [Act] or regulations or decisions issued pursuant to this [Act]."). In enacting section 7135, Congress did not intend for the Authority or the courts to pay any deference to the earlier Council interpretations of the Executive Order, but to "take a fresh and independent approach to federal labor relations." American Federation, 775 F.2d at 1027; National Treasury Employees Union v. FLRA, 691 F.2d 553, 562 n. 89 (D.C.Cir.1982) (National Treasury ). Congress intended merely to prevent the slate from being wiped clean until the Authority and the courts could interpret the Act in a manner consistent with Congress's intent. See National Treasury, 691 F.2d at 562 n. 89. Congress was apparently irritated by the Council's "broad interpretations" of the Order that "tied the hands of agency management in effectively addressing agency concerns." 124 Cong.Rec.H. 9649 (daily ed. Sept. 13, 1978), reprinted in Legislative History at 954 (statement of Congressman Clay). Thus, Aeronautical Center is not persuasive authority for recognizing a statutory right to wear a union button from the language in the Executive Order granting employees the right to assist labor organizations.
 
 
 34
 We conclude that nothing in section 7102's legislative history supports the Authority's position that federal employees enjoy greater rights to assist their unions than private sector employees do under section 7 of the NLRA. We believe that to hold that section 7102's "form and assist" language creates a statutory right to wear union buttons would be inconsistent with our holding in Harrah's Club, where we concluded that a private sector employee's qualified right to wear a union button derived from section 7's right to engage in other concerted activity. Harrah's Club, 337 F.2d at 179. We did not bottom the right to wear a union button on the statutorily granted authority to assist a labor organization, although we could have because section 7, like section 7102, gives employees the right to do so. Thus, under Harrah's Club and our subsequent cases interpreting section 7, any "right" to wear union insignia derives from the right to engage in other concerted activities for the purpose of collective bargaining or other mutual aid and protection. Id. at 179; see also Rooney, 677 F.2d at 47; Pay'N Save Corp., 641 F.2d at 700. Section 7102 does not contain, as does section 7, the right to engage in other concerted activities. Absent this statutory authority to engage in other concerted activities, we refuse to conclude that section 7102 grants public contact federal uniformed employees a statutory right to wear union insignia on the job.
 
 
 35
 Our interpretation is consistent with the Supreme Court's conclusion that "the lack of protection for concerted activities ... indicate[s] an intention ... to regulate the location or form of [federal] employee speech to a somewhat greater extent than under the NLRA." Letter Carriers, 418 U.S. at 278 n. 13, 94 S.Ct. at 2778 n. 13. This conclusion is also consistent with Congress's admonition to interpret the Act "in a manner consistent with the requirement of an effective and efficient Government." 5 U.S.C. Sec. 7101(b). This interpretation of section 7102 does not mean that federal employers may not "assist" unions in other ways. Cf. News-Texan v. NLRB, 422 F.2d 381, 382, 386 (5th Cir.1970) (a non-union employee has a section 7 "right to assist" a labor organization by passing certain general information concerning the employer to a union negotiating with the employer); Signal Oil & Gas Co. v. NLRB, 390 F.2d 338, 342-43 (9th Cir.1968) (a non-union employee has a section 7 "right to assist" a labor organization by stating to another non-union employee that he hopes that the union will strike at the refinery in order to drive up wages). We refuse, however, to defer to an interpretation of section 7102 that grants to federal employees greater rights than those enjoyed by similarly situated private sector employees.
 
 B.
 
 36
 Even if section 7102 did grant public contact employees a statutory right to adorn their official uniforms with union insignia while on duty, we believe that section 7106(b)(1), which protects the government's authority to determine the "methods and means of performing work," 5 U.S.C. Sec. 7106(b)(1), limits that right in these cases. Both parties admit, and we agree, that section 7106(b)(1) gives the INS the right to dictate that the inspectors wear uniforms. See American Federation, 775 F.2d at 1025. The Authority nonetheless argues that the INS's section 7106 right to require a uniform does not enable it unilaterally to forbid an employee from wearing union insignia. The INS argues that even if section 7102 grants certain public employees the right to wear union insignia while on duty, section 7106(b)(1) authorizes the INS to prohibit its uniformed employees from wearing such insignia.
 
 
 37
 Our examination of section 7106(b)(1) begins with the statute itself. Lewis, 445 U.S. at 60, 100 S.Ct. at 918. Section 7106 does not clearly address whether the rights granted to management in section 7106 limit the rights granted employees in section 7102. Thus, we will examine the statutory scheme and legislative history to determine whether Congress addressed the issue concerning the relationship between employees' rights under section 7102 and management rights of the government under section 7106.
 
 
 38
 President Carter signed the Civil Service Reform Act of 1978, Pub.L. No. 95-454, 92 Stat. 1111, on October 13, 1978. The Act is Title VII of this statute. 5 U.S.C. Secs. 7101-7135. The Act thoroughly restructured federal labor relations. Bureau of Alcohol, 464 U.S. at 91-93, 104 S.Ct. at 441-42. Before the passage of the Act, Executive Order No. 10,988, 3 C.F.R. 521 (1959-1963 Cong.), governed labor-management relations in the federal sector. Id., 464 U.S. at 91, 104 S.Ct. at 441. The Executive Order program was revised and continued by Executive Order No. 11491, 3 C.F.R. 861 (1966-1970 Cong.), as amended by Executive Order Nos. 11616, 11636, and 11383, 3 C.F.R. 605, 634, 957 (1971-1975 Cong.). Id., at 91 n. 2, 104 S.Ct. at 441 n. 2. The Act was intended to strengthen the position of public employee unions while preserving the ability of government managers to maintain an effective and efficient government. Id. at 92, 104 S.Ct. at 441. Thus, Congress specifically required the Authority and the courts to interpret the Act "in a manner consistent with an effective and efficient government." 5 U.S.C. Sec. 7101(b).
 
 
 39
 Section 7106's legislative history indicates that Congress was dissatisfied with the discretion given federal managers under the Executive Order. Initially, the Senate and the President desired to preserve the status quo from section 12 of the Executive Order concerning management's rights.[3] In House committee, this approach was "overwhelmingly rejected." See 124 Cong.Rec. H. 4509 (daily ed. Aug. 10, 1978) (statement of Congressman Clay), reprinted in Legislative History at 844-45. In taking a different approach, the House committee spelled out management's rights in H.R. 11280,[4] particularly regarding the scope of negotiability.
 
 
 40
 On the floor, Representative Udall successfully offered an amendment to H.R. 11280 which substantially enlarged the management rights clause. Congressman Udall stated that the revised committee bill
 
 
 41
 attempted to navigate a course which gives Federal employees greater rights in labor relations than they have heretofore enjoyed. At the same time we have preserved the rights of management to run the shop. I believe the time has simply come for Federal employees to enjoy some, if not all, of the same rights which employees in the private sector have had since 1935. We do not permit bargaining over pay and fringe benefits, but on other issues relating to an employee's livelihood, we do permit collective bargaining between Federal employee unions and agency management.
 
 
 42
 124 Cong.Rec.H. 8462 (daily ed. Aug. 11, 1978), reprinted in Legislative History at 850.
 
 
 43
 Congress adopted Representative Udall's proposal and codified it into section 7106.[5] The enlarged management rights section of 7106 easily breaks into three categories. First, in section 7106(a), Congress has prescribed certain non-negotiable management rights which no collective bargaining agreement may diminish, subject to the limitations contained in subsection (b). Second, in section 7106(b)(1), Congress has prescribed certain subjects which an agency may elect to negotiate or not negotiate with a labor organization. Third, in sections 7106(b)(2) and (b)(3), Congress has prescribed certain subjects which are negotiable.
 
 
 44
 The decision to require uniforms involves a management decision as to the means of performing work within section 7106(b)(1) and is therefore a subject for bargaining only at the employer's election. See American Federation, 775 F.2d at 1025 (section 7106(b)(1) gives management the right to require uniforms); United States Department of Justice v. FLRA, 727 F.2d 481, 488 (5th Cir.1984) (Department of Justice ) (decision whether an INS agent will wear a uniform on a particular assignment involves a determination of the "means" of performing work within meaning of section 7106(b)(1)); see also National Association of Government Employees, Locals R5-91, R5-107, and R5-120 v. FLRA, 771 F.2d 1449, 1452 (11th Cir.1985) (per curiam); American Federation of Government Employees, Local 3013 v. FLRA, 762 F.2d 183, 184 (1st Cir.1985) (per curiam); New York Council, Association of Civilian Technicians v. FLRA, 757 F.2d 502, 509-10 (2d Cir.), cert. denied, 474 U.S. 846, 106 S.Ct. 137, 88 L.Ed.2d 113 (1985). We believe that the right to require a uniform "necessarily encompasses" the right to require an unadorned uniform. See Department of Justice, 727 F.2d at 488 (right to assign work necessarily encompasses the right to determine when it will be performed). The uniform requirement fosters discipline, promotes uniformity, encourages esprit de corps, and increases readiness. See American Federation, 775 F.2d at 1025. To allow employees to adorn their uniforms with objects of their own choosing undermines the very purposes that uniforms serve. Cf. Goldman v. Weinberger, 475 U.S. 503, 508, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986) ("the traditional outfitting of personnel in standardized uniforms encourages the subordination of personal preferences and identities in favor of the overall group mission.") (emphasis added).
 
 
 45
 Section 7106's management rights provision is noticeably absent from the NLRA. The provision recognizes the obvious difference between public sector employees and private sector employees. The federal government is not a private corporation responsible to a few stockholders, but a sovereign entity responsible to all taxpayers. See 124 Cong.Rec. H. 9647 (daily ed. Sept. 13, 1978), reprinted in Legislative History at 950 (statements of Congressman Lott discussing why picketing should be an unfair labor practice). The most obvious difference between the two labor statutes is the significant public interest that applies to federal managers attempting to effectuate congressional and executive policy. The INS's decision to require enforcement officers to wear unadorned uniforms implicates that weighty public interest.
 
 
 46
 In spite of the absence of an explicit management rights provision in the NLRA, the management interest in requiring unadorned uniforms has been recognized in private sector cases as well. The Sixth Circuit has recognized that concerns over discipline and presenting a clean professional image justified a private employer in prohibiting its restaurant employees from wearing unauthorized union buttons on their official uniforms. Burger King v. NLRB, 725 F.2d 1053, 1055 (6th Cir.1984). Similarly, in Harrah's Club, we recognized that a private employer was justified in prohibiting its casino employees from wearing unauthorized union buttons on their official uniforms. See Harrah's Club, 337 F.2d at 178-79. As a law enforcement agency, the INS clearly has a greater interest in fostering discipline, promoting uniformity, encouraging esprit de corps, and enhancing the identification of its employees as members of its organization than a casino or restaurant does. See American Federation, 775 F.2d at 1025.
 
 
 47
 We conclude that the inclusion of the management rights section in the Act was intended to allow agencies such as the INS to govern the appearance of their public contact employees. This conclusion is bolstered by Congress's direction to interpret the Act "in a manner consistent with the requirement of an effective and efficient Government." 5 U.S.C. Sec. 7101(b); Department of Justice, 727 F.2d at 488-89 (requiring INS officers to wear uniforms promotes effectiveness and efficiency of INS). Therefore, we hold that section 7106(b)(1), which allows federal management the authority to determine the "methods and means of performing work," grants the INS the authority to restrict the ability of its public contact employees to wear union insignia on their official uniforms while on duty unless it chooses to negotiate otherwise.
 
 
 48
 The Authority ignored section 7106 when reaching its conclusion that the INS committed unfair labor practices in this case. Instead, the Authority analyzed whether special circumstances existed that justified the INS's ban on the pin and the penholder. In applying the "special circumstances" balancing approach, the Authority adopted the analysis that the Board and courts engage in when analyzing limitations on an employee's section 7 rights. See, e.g., Pay'N Save, 641 F.2d at 700-02 (upon determining that section 7 protects an employee's right to wear a union button in support of an attempt to organize all employees, the court analyzed whether "special circumstances" justified an employer's policy prohibiting employees from wearing political, controversial, or offensive insignia on store jackets). In light of the differences between the two statutory schemes outlined above, we conclude that the Authority's decision to adopt the "special circumstances" balancing test appropriate under the NLRA to weigh the INS's strong interest in requiring an unadorned uniform against the employee's interest in wearing union insignia was not reasoned and supportable.
 
 
 49
 We reach this result while recognizing that, notwithstanding the INS's longstanding policy against unofficial uniform adornments, a few individuals did wear unofficial uniform adornments such as an olympic pin or a baseball pin on a few occasions and were not asked to remove them. The record does not show whether the supervisors even noticed these transgressions. In any event, however, we refuse to conclude that the INS waived the ability to require unadorned uniforms by failing to take action with respect to these minor transgressions. These rare and incidental departures from a consistently enforced rule do not prevent the INS from enforcing its rule. See Burger King, 725 F.2d at 1055.
 
 
 50
 In light of our conclusion concerning federal management's rights under section 7106 in the facts of this case, we express no opinion as to the propriety of "special circumstances" balancing in other contexts.
 
 IV
 
 51
 The Union, as intervenor, argues that the INS's administrative regulation prescribing the uniform requirement for immigration inspectors, which states that the uniform "be complete in all details and devoid of all ornaments which are not part of the uniform," violates the first amendment. [Intervenor's Brief at 10-15] The Union contends that the regulation does not meet the requirements set forth in Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (Connick ), and Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (Pickering ).
 
 
 52
 Connick and Pickering recognize that the government may not condition public employment on a basis that violates the public employee's first amendment rights. When adjudicating a public employee's claim that a statute or regulation violates the first amendment, we must strike "a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Connick, 461 U.S. at 142, 103 S.Ct. at 1687, quoting Pickering, 391 U.S. at 568, 88 S.Ct. at 1734-35. "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Id., 461 U.S. at 147-48, 103 S.Ct. at 1690.
 
 
 53
 Assuming that the immigration inspectors did not waive this first amendment argument in the collective bargaining agreement and assuming that the wearing of the button and the penholder constituted speech on a matter of public concern, we find no first amendment violation in this case. The INS is legitimately concerned with the efficiency of the public service its employees perform. See Rankin v. McPherson, --- U.S. ----, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987) (Rankin ). The INS anti-adornment regulation furthers its interest in the efficient functioning of the department because it makes the inspectors more readily recognizable to the public, encourages esprit de corps, and subordinates personal preferences in favor of the overall group mission. See Kelley v. Johnson, 425 U.S. 238, 246-48, 96 S.Ct. 1440, 1445-46, 47 L.Ed.2d 708 (1976) (Kelley ).
 
 
 54
 Balancing the immigration inspectors' interest in wearing the union adornments, Rankin, 107 S.Ct. at 2898, we believe it is significant that the regulation does not attempt to regulate the immigration inspectors' off-duty speech. Therefore, the Union errs in relying on Berger v. Battaglia, 779 F.2d 992, 993 (4th Cir.1985) (Battaglia ) (right of an off-duty police officer to participate in a public performance in blackface upheld); Wilson v. Taylor, 733 F.2d 1539, 1542-44 (11th Cir.1984) (right of off-duty police officer to date the daughter of an organized crime figure upheld); and Leonard v. City of Columbus, 705 F.2d 1299, 1306 & n. 5 (11th Cir.1983) (right of off-duty police officers to remove American flags from their uniforms as a symbolic protest upheld). Moreover, the regulation in this case is not directed at any particular viewpoint, or even at expression per se. The regulation is addressed to appearance. As such, it has only an incidental effect on speech. Compare Battaglia, 779 F.2d 992 (police officer barred from appearing in musical performance).
 
 
 55
 We conclude that the regulation is more akin to the grooming regulation sustained against constitutional attack in Kelley, 425 U.S. at 245-48, 96 S.Ct. at 1444-46 (rejecting police officer's due process challenge to a police hair-grooming regulation). The restriction imposed by the regulation is viewpoint-neutral and limited to working hours, and is thus tailored to achieving the INS's interest in having its employees wear unadorned uniforms, while leaving the immigration inspectors free to express their views in other ways and during non-working hours. In these circumstances, we find that the balance tips in favor of the interests asserted by the INS and against the immigration inspectors' interest in wearing unofficial adornments on their uniforms.
 
 
 56
 The Union, relying on Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972), and Communist Party v. Subversive Activities Control Board, 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961), argues that the INS's enforcement of the regulation in these cases amounted to viewpoint discrimination in violation of the first amendment. The Union claims that because some immigration inspectors occasionally wore tie tacks and belt buckles with messages on them, black armbands, INS approved pins, a baseball button, and an Olympic pin, the enforcement in these cases of the anti-adornment restrictions contained in section 2415.01 of the manual violated the first amendment.
 
 
 57
 We disagree. The tie tacks and belt buckles are irrelevant because the regulation does not prescribe a specific tie tack or belt buckle. Thus, unlike wearing an unauthorized button or penholder, belt buckles and tie tacks do not violate the regulation. The wearing of service pins and black armbands do not help the Union's argument. The INS clearly authorized its inspectors to wear such material as part of the uniform; therefore, they can hardly be described as ornaments not part of the uniform. Finally, the argument based upon the baseball button and the Olympic pin is not persuasive. The record does not reflect that these transgressions were noticed by the inspectors' superiors. Even if they were, however, rare transgressions from an otherwise consistently enforced rule does not establish that the INS's enforcement in these cases constituted viewpoint discrimination.
 
 V
 
 58
 In summary, the INS did not commit an unfair labor practice in ordering Stark and Walker to remove their union insignias from their official uniforms. The right to assist a labor organization guaranteed by section 7102 does not create a statutory right for these federal employees to wear union insignia while on duty. In addition, even if section 7102 does create the right to wear a union button in these cases before us, the rights of management guaranteed by section 7106(b)(1) limit those rights and allow the INS to order removal of the pin and penholder. Finally, the INS anti-adornment regulation does not violate the first amendment.
 
 
 59
 ENFORCEMENT DENIED.
 
 NORRIS, Circuit Judge, dissenting:
 
 60
 The "special function" of the Federal Labor Relations Authority is to give meaning to the general provisions of the act it administers. Bureau of Alcohol, Tobacco and Firearms v. FLRA, 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983). In recognition of the Authority's congressional mandate and its acknowledged expertise in the field of federal labor relations, the judiciary affords "considerable deference" to the Authority's interpretations of the Federal Service Labor-Management Relations Act (FSLRA), 5 U.S.C. Secs. 7101-7135. Id. Although we should not rubber-stamp interpretations that are inconsistent with the governing statute or that frustrate the will of Congress, "courts should uphold reasonable and defensible constructions of an agency's enabling Act." Id.
 
 
 61
 The majority pays lip service to this rule of deferential review of decisions of the Authority. In the case at hand, the Authority construed section 7102 of the FSLRA ("[e]ach employee shall have the right to form, join, or assist any labor organization....") to confer a protected right of federal employees to wear union insignia. Without citing a single line of legislative history advancing a contrary interpretation of this section of the Act, the majority overturns the Authority's interpretation as inconsistent with congressional policy. The majority turns deference on its head. Rather than upholding the Authority's interpretation in the absence of some congressional statement of contrary intent, the majority reverses the Authority because it finds nothing in an admittedly sparse legislative record to support the Authority's interpretation. Opinion at 1461. In so doing, the majority simply makes its own findings of fact and substitutes its construction of the Act for the Authority's, even though the Authority is the agency that Congress specially created "to give content to the principles and goals set forth in the Act." Bureau of Alcohol, Tobacco and Firearms, 464 U.S. at 97, 104 S.Ct. at 444.
 
 
 62
 The majority makes essentially two arguments. The first rests entirely on an analogy from the private sector: Congress simply could not have intended to grant federal employees a "greater" right to wear union insignia under section 7102 of the FSLRA than it granted to private sector employees under section 7 of the National Labor Relations Act (NLRA), 29 U.S.C. Sec. 158(a)(1). Maj. op. at 1461-62; see NLRB v. Harrah's Club, 337 F.2d 177 (9th Cir.1964). As the Second Circuit recently cautioned, however, "[w]hile private sector analogies are useful, it is obvious that public sector labor relations may vary depending upon the statutory provisions and legal concepts involved." AFGE v. FLRA, 811 F.2d 769, 773 (2d Cir.1987); see also Library of Congress v. FLRA, 699 F.2d 1280, 1287 (D.C.Cir.1983). In this case, the legal concepts underlying the right of private sector employees to wear union insignia differ significantly from the legal concepts underlying that right in the public sector. In defining the insignia-wearing rights of federal employees under the FSLRA, Congress necessarily has to accommodate the First Amendment interests of public employees. The First Amendment is a floor below which Congress cannot go. No such accommodation is necessary when Congress grants statutory protection to private employees.[1] Accordingly, it is unremarkable that the Authority interpreted the FSLRA as granting public employees a more expansive right to wear union insignia than exists for private employees under the NLRA. Far from contravening congressional intent, the Authority's decision is a reasoned effort to interpret the Act in a manner that respects Congress' effort to accommodate the free speech interests of public employees, and perhaps avoid costly litigation over their First Amendment rights.
 
 
 63
 The majority's second argument turns on an expansive interpretation of section 7106, the statutory provision which protects an agency's management prerogative to determine the "methods and means" by which work is performed. The majority concludes that even if the Authority was reasonable in construing section 7102 as creating a right on the part of federal employees to wear union insignia, this right is limited by section 7106. It is undisputed that section 7106 authorizes the INS to require its employees to wear uniforms. The majority goes on to rule, however, that the right to require uniforms "necessarily encompasses" the right to require an unadorned uniform, citing United States Department of Justice v. FLRA, 727 F.2d 481, 488 (5th Cir.1984). The majority's reliance on Department of Justice is misplaced because the Fifth Circuit was not required in that case to weigh the competing interests protected by sections 7102 and 7106. The court simply held that after the expiration of a collective bargaining agreement that imposed some restrictions on the freedom of the INS to decide when and where employees worked, section 7106 protected INS's management right to decide unilaterally whether to require employees to work at nighttime check-points established by the INS. Section 7102 was never mentioned in the Fifth Circuit opinion for the obvious reason: section 7102 does not give public employees any right to choose when and where they work. Thus, Department of Justice did not implicate the free speech interests of public employees.[2] Here, in contrast, the federal agency's rights under section 7106 must be weighed against employee rights protected by section 7102.
 
 
 64
 Although the majority chides the Authority for ignoring section 7106 in this case (Maj. op. at 1465), the record shows that the Authority did weigh the interests of the agency in effective and efficient management that are protected by section 7106. After explicitly considering these interests, the Authority concluded that section 7106 was not a bar to the exercise of the employees' rights under section 7102 because there was no reason to believe "that the wearing of the [union insignia] interfered in any way with the purpose for which the Agency [INS] requires the uniform to be worn." Excerpt of Record (ER) at 5 (emphasis added). The Authority's balancing approach, which is plainly the correct one, contrasts sharply with the "divide and conquer" approach to the statute embraced by the majority. The Authority is the proper body to strike such a fact-specific balance, and I would accord the Authority the deference Congress intended it to have.
 
 
 65
 The reasonableness of the Authority's interpretation of the statutory scheme is reinforced by the fact that the activities engaged in by Stark and Walker are, I believe, protected by the First Amendment. To my mind, the INS has not satisfied the standards enunciated by the Supreme Court in Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). These cases, as the majority concedes, require us to strike "a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Connick, 461 U.S. at 142, 103 S.Ct. at 1687, quoting Pickering, 391 U.S. at 568, 88 S.Ct. at 1734-35. The majority performs this balance in a mechanical fashion to conclude that the INS' interests in making inspectors more readily recognizable to the public, encouraging esprit de corps, and subordinating personal preferences in favor of the overall group mission outweigh the employees' interests in engaging in what is undoubtedly core First Amendment expression. What the majority completely fails to do, however, is articulate how or why the wearing of the union insignia interferes with any of the INS' objectives. The majority seems to be untroubled by the fact that the INS has not even begun to make the constitutionally required demonstration that its interests are in fact being frustrated by the wearing of the insignia. Indeed, to the extent that any factual determinations on this issue have been made, they have been made by the Authority, which concluded as a factual matter that there "has been no showing that the wearing of the [insignia] interfered in any way with the purpose for which the Agency requires the uniform to be worn." ER at 5. This factual determination by the Authority is conclusive if supported by "substantial evidence on the record considered as a whole." 5 U.S.C. Sec. 7123(c). The majority makes no attempt to explain why the Authority's factual determination in this regard is not supported by the record. As I read the record, this would be a difficult, if not impossible, task.
 
 
 66
 There is no reason to believe, for example, that the wearing of the insignia makes the INS officials any less recognizable to the public. An INS uniform consisting of a standardized shirt, tie, trousers, shoes, badge, nameplate and perhaps a cap would make INS officials recognizable to the general public whether or not individual officials were also wearing small unobtrusive union insignia. This at least was the conclusion of the Authority, which found as a matter of fact that "[the union insignia] did not and could not reasonably be expected ... to interfere with the public's ability to recognize [the INS official] as a representative of a Government authority." ER at 5. Once again, the majority offers no explanation why this determination is not supported by substantial evidence.
 
 
 67
 Nor does the majority suggest how the wearing of the insignia interferes with esprit de corps or prevents the INS from subordinating personal preferences in favor of the overall group mission, any more so than the wearing of personalized belt buckles or tie tacks, which are items the INS has not seen fit to standardize as part of the uniform. Indeed, the fact that the INS has not prescribed every detail of its uniform undermines its claim that absolute uniformity is essential to the INS' mission.[3]
 
 
 68
 Viewed in light of the fact that the INS actions at least arguably violate the First Amendment, the Authority's interpretation of the statutory scheme seems eminently reasonable. Federal statutes should be interpreted and applied so as to avoid constitutional problems, if fairly possible. See Ashwander v. TVA, 297 U.S. 288, 348, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936). If, as the majority insists, Congress truly intended section 7106 to be construed as authorizing the INS to prohibit the insignia without making a showing that such expressive activity would in fact interfere with INS officials' job performance, section 7106 would raise serious First Amendment questions. The Authority was well within the scope of its authority in balancing the statutory interests in such a way as to avoid this result. The problem with the majority is that it accepts uncritically the word of one federal agency, the INS, while failing to afford the proper deference to the agency whose "special function" is to give meaning to the general provisions of the FSLRA.
 
 
 69
 In my view, the Authority's interpretation of the statute is plainly reasonable. I would grant the Authority the deference it is due and enforce the order.
 
 
 
 [1]
 Section 7116 provides:
 (a) For the purpose of this chapter, it shall be an unfair labor practice for an agency--
 (1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter;
 * * *
 (5) to refuse to consult or negotiate in good faith with a labor organization or required by this chapter; ...
 
 
 [2]
 Section 7102 provides that:
 Each employee shall have the right to form, join, or assist any labor organization, or to refrain from such activity, freely and without fear of penalty or reprisal, and each employee shall be protected in the exercise of such right. Except as otherwise provided under this chapter, such right includes the right--
 (1) to act for a labor organization in the capacity of a representative and the right, in that capacity, to present the views of the labor organization to heads of agencies and other officials of the executive branch of the Government, the Congress, or other appropriate authorities, and
 (2) to engage in collective bargaining with respect to conditions of employment through representatives chosen by employees under this chapter.
 5 U.S.C. Sec. 7102.
 
 
 [3]
 Section 12 of the Executive Order provided that:
 Sec. 12. Basic provisions of agreements. Each agreement between an agency and a labor organization is subject to the following requirements--
 (b) management officials of the agency retain the right, in accordance with applicable laws and regulations--
 (1) to direct employees of the agency;
 (2) to hire, promote, transfer, assign, and retain employees in positions within the agency, and to suspend, demote, discharge, or take other disciplinary action against employees;
 (3) to relieve employees from duties because of lack of work or for other legitimate reasons;
 (4) to maintain the efficiency of the Government operations entrusted to them;
 (5) to determine the methods, means, and personnel by which such operations are to be conducted; and
 (6) to take whatever actions may be necessary to carry out the mission of the agency in situations of emergency; and
 Exec. Order No. 11491, reprinted in 5 U.S.C.A. Sec. 7101 at 10.
 
 
 [4]
 H.R. 11280 provided:
 Sec. 7106. Management rights
 (a) Nothing in this chapter shall affect the authority of any management official of any agency--
 (1) subject to subsection (b), to determine the mission, budget, organization, and internal security practices of such agency; and
 (2) in accordance with applicable laws, to take whatever actions as may be necessary to carry out the mission of such agency during national emergencies.
 (b) Nothing in this section shall preclude any agency and labor organization from negotiating--
 (1) procedures which management officials of such agency will observe in exercising their authority to determine the mission, budget, organization, and internal security of such agency, or
 (2) appropriate arrangements for employees adversely affected by the exercise of such authority by such management officials.
 Staff of House Subcommittee on Postal Personnel and Modernization of the Committee on Post Office and Civil Service, 1st Sess., Title VII--Federal Service Labor Management Relations at 15-16 (Comm. Print 1978), reprinted in Legislative History at 325-26.
 
 
 [5]
 Section 7106 provides:
 (a) Subject to subsection (b) of this section, nothing in this chapter shall affect the authority of any management official of any agency--
 (1) to determine the mission, budget, organization, number of employees, and internal security practices of such agency; and
 (2) in accordance with applicable laws--
 (A) to hire, assign, direct, layoff, and retain employees in the agency, or to suspend, remove, reduce in grade or pay, or take other disciplinary action against such employees;
 (B) to assign work, to make determinations with respect to contracting out, and to determine the personnel by which agency operations shall be conducted;
 (C) with respect to filling positions, to make selections for appointments from--
 (i) among properly ranked and certified candidates for promotion; or
 (ii) any other appropriate source; and
 (D) to take whatever actions may be necessary to carry out the agency mission during national emergencies.
 (b) Nothing in this section shall preclude any agency and any labor organization from negotiating--
 (1) at the election of the agency, on the numbers, types, and grades of employees or positions assigned to any organizational subdivision, work project, or tour of duty, or on the technology, methods, and means of performing work;
 (2) procedures which management officials of the agency will observe in exercising any authority under this section; or
 (3) appropriate arrangements for employees adversely affecting by the exercise of any authority under this section by such management officials.
 
 
 [1]
 Indeed, the Supreme Court has recognized that the First Amendment is not necessarily relevant in the private sector labor context and has held that the "Free Speech and Assembly" provision of the Labor Management Reporting and Disclosure Act, 29 U.S.C. Sec. 411(a)(2), does not to grant rights coextensive with the First Amendment. United Steelworkers v. Sadlowski, 457 U.S. 102, 111, 102 S.Ct. 2339, 2345, 72 L.Ed.2d 707 (1982). In the public sector context, Congress has no choice but to respect the First Amendment rights of federal employees
 
 
 [2]
 Moreover, in Department of Justice, the court was convinced that preventing the INS from establishing night-time checkpoints would have frustrated the INS's mission. 727 F.2d at 488. Here, the Authority found that the INS had failed to make a showing that the wearing of union insignia frustrated the INS's goals in any way. See infra, 1469-70
 
 
 [3]
 The INS is thus different from the military in this regard. The military, because of its compelling need to subordinate personal interests to those of the group, has prescribed uniforms down to the last detail. See Goldman v. Weinberger, 475 U.S. 503, 508, 106 S.Ct. 1310, 1313, 89 L.Ed.2d 478 (1986)