United States Court of Appeals
Fifth Circuit

**F I L E D**

**October 5, 2006**

Charles R. Fulbruge III
Clerk

REVISED OCTOBER 20, 2006
IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 03-50230
_____


COMMUNICATIONS WORKERS OF AMERICA; URBANO HERRERA,


Plaintiffs-Appellees,


versus


ECTOR COUNTY HOSPITAL DISTRICT,
doing business as Medical Center
Hospital, ET AL,


Defendants,


ECTOR COUNTY HOSPITAL DISTRICT,
doing business as Medical Center Hospital,


Defendant-Appellant.



_____

Appeal from the United States District Court
for the Western District of Texas
_____


Before JONES, Chief Judge, KING, GARWOOD, JOLLY, HIGGINBOTHAM,
DAVIS, SMITH, WIENER, BARKSDALE, GARZA, DeMOSS, BENAVIDES, STEWART,
DENNIS, CLEMENT, PRADO, and OWEN, Circuit Judges.

GARWOOD, Circuit Judge:

Defendant-appellant Ector County Hospital District, a

political subdivision of the State of Texas which owns and operates

the Medical Center Hospital in Odessa, Texas, appeals the district court's judgment in favor of plaintiffs-appellees Urbano Herrera, an employee of the Hospital, and Communications Workers of America, the union to which Herrera belongs. The district court ruled that the Hospital violated the First Amendment rights of Herrera and the union by disciplining Herrera for violating the Hospital's uniform non-adornment policy by refusing to remove the "Union Yes" button worn on his uniform while at work at the Hospital on November 11, 1999. The district court issued a permanent injunction requiring the Hospital "to allow all of the employees in its 'Integrated Services' organization to wear pro-union buttons," awarded the plaintiffs some $91,000 attorney's fees and awarded Herrera $548.85 damages.[1] A divided panel of this court affirmed. *Communications Workers of America v. Ector County Hospital District*, 392 F.3d 733 (5th Cir. 2004) (*CWA III*). We subsequently took the case en banc. *Communications Workers of America v. Ector County Hospital District*, 402 F.3d 503 (5th Cir. 2005). We now reverse, holding

---

[1] *Communications Workers of America v. Ector County Hospital District*, 241 F. Supp. 2d 617, 638 (W.D. Tex. 2002) (*CWA II*). The court defined the Hospital's "Integrated Services" organization as "including, but not limited to, Engineering, Housekeeping, Dietary, Laundry, Printing, Customer Support Services, Transport, Purchasing and Central Supply, and Distribution." *Id*. at 634.

The Engineering Department has some 40 employees and includes carpenters, plumbers, electricians, locksmiths, painters, and general maintenance. Herrera is and was a carpenter.

*See also Herrera v. Medical Center Hospital*, 241 F. Supp. 2d 601 (E.D. La. 2002) (a different district judge, sitting by designation) (rulings on summary judgment motions) (*CWA I*).

that, under the balancing test of *Pickering v. Board of Education*, 88 S.Ct. 1731, 1734-35 (1968), the interest of the Hospital in promoting the efficiency of the public service it performs by means of its uniform non-adornment policy outweighs the interest of its Integrated Services employees such as Herrera in wearing a "Union Yes" button on their uniforms while on duty at the Hospital.

### Facts and Proceedings Below

The district court partially granted the motion for summary judgment of plaintiffs and ruled that Herrera's wearing of the "Union Yes" button on his uniform while at work constituted speech on a matter of public concern, but further ruled that resolving the appropriate *Pickering* balancing required an actual trial. *CWA I*.[2]

Subsequently, the case proceeded to trial before a jury in October 2002, with the Hospital assigned the burden of proof on the *Pickering* balance issue. At the conclusion of the Hospital's evidence, the district court granted the plaintiffs' motion for judgment as a matter of law, discharged the jury and entered the above described judgment for plaintiffs. *CWA II*, 241 F. Supp. 2d at 638. The court concluded that under the evidence "the *Pickering*

---

[2] The court also ruled that the Union had standing to sue in its own right, but not as representative of any Hospital employee, and that the individual defendants – the supervisors who disciplined Herrera and the members of the district's board of directors – were entitled to qualified immunity (a ruling which has not since been questioned). *Id*.

3

balancing test favors Plaintiffs." *Id.* at 632. The panel majority affirmed, reaching the same conclusion. *CWA III*, 392 F.3d at 742-46.

The undisputed trial evidence reflects that the Medical Center Hospital is a political subdivision of the State of Texas governed by an uncompensated seven person board of directors elected from single member districts and serving staggered two year terms. Medical Center Hospital's mission is "to provide high quality health care to the residents of the Permian Basin, including Odessa but also the outlying counties." It is a "full service hospital," and, among other things, is the "lead facility for trauma cases" in its area, provides "a full service operating room operating seven days a week, generally twenty-four hours a day," delivers approximately 120 babies a month, has "an extensive cardiac program," and was "listed as one of the top 100 cardiovascular hospitals in the country." Indigent care is provided and patients are not turned away "because they can't pay or don't have insurance." The Hospital has "slightly over 1500 employees." It has a single cafeteria (apparently located on the ground floor) which is used by Hospital employees, patients and visitors for meals, breaks and the like.

Under the Hospital's established dress code policy, all employees were and are required to wear a uniform while on duty. The required uniform for carpenters (such as Herrera),

4

electricians, plumbers, and others in similar positions, consists of a gray shirt and gray pants. The policy provides that "ONLY pins representing the professional association and the most current hospital service award may be worn." It also provides that the dress code will be enforced "uniformly throughout Medical Center Hospital." The trial evidence reflects that the same policies with respect to dress code and the wearing of pins apply to carpenters as apply to all other employees. The undisputed evidence at trial also reflected the stated exception for pins representing "professional association" does *not* refer to pins representing membership in an organization but rather to those representing professional credentials, as, for example, nurses who have received a Bachelor's degree in nursing, or a Master's degree, "that individual can wear the professional pin, a designation of those credentials that person has earned." The evidence also showed that three other exceptions had been made to the anti-adornment policy. There was testimony that, for more than fourteen years, during the week (or on the day) before the annual football game between Odessa High School and Permian High School the Hospital allows its employees "to celebrate the school they support by wearing the colors of their school." The uncontradicted evidence was that this was "to encourage a little esprit de corps and friendly camaraderie" and had never resulted in any tension at the Hospital. Exceptions were also made "twice a year" to accommodate two other

5

occasions. One is the "Great American Smoke Out" day, on which the Hospital, which is a smoke-free facility, sets up a booth which passes out pins, "monikers" and gum to people to get them not to smoke that day. The second exception is that the Hospital, where "blood shortages" are a "very difficult problem," has blood drives and donors are given and may wear "a little pin saying I'm a donor." The uncontradicted evidence is that these pins cause no disruption but "only build esprit de corps and build morale."

The trial evidence reflects the following respecting the incident giving rise to this suit. On November 11, 1999, Hospital employee Herrera, a carpenter, wore a "Union Yes" button on his uniform while at work at the Hospital renovating a vacant patient room, adjacent to occupied patient rooms, on the seventh floor, the labor and delivery floor, of the Hospital.[3] As Herrera was waiting for the elevator to go to the cafeteria for his morning break, he came into contact with Tim Daniels, the Hospital general maintenance supervisor, who told him to remove the "Union Yes" button as it was not allowed by the Hospital's dress code. Herrera refused to remove the button and told Daniels to "show me the

_____

[3] Herrera had joined the Union some time in the summer of 1999. At a Union evening meeting the local union president (who was not a Hospital employee) had passed out buttons to all members in attendance, not simply members who were Hospital employees, and Herrera received his button at that meeting. The president told them to wear the button at work. Herrera's good friend Medrano, then a plumber employed by the Hospital who had joined the Union about when Herrera did, was also present at that meeting and likewise received a "Union Yes" button there.

6

policy." Daniels did not have the policy with him. Herrera proceeded to the cafeteria where he joined his good friend Medrano, a plumber employed by the Hospital and likewise a Union member who also had worn a "Union Yes" button to work that day.[4] Shortly after 9:30 a.m. Daniels and John Durham, the Hospital's Technical Services Director, and supervisor over both Daniels and Herrera, came into the cafeteria, and, as reflected by the undisputed testimony of Herrera, Medrano and Durham, Durham explained the non-adornment policy to Herrera and asked him to remove the "Union Yes" button and Herrera declined. On being asked again, Herrera replied "I'm not going to take it off. If you want it off, then you take it off." Durham then replied "Let's go to my office." At that point Herrera pushed back from the table, stood up, thrust his fist in the air and yelled "Union up." Herrera testified that he "yelled it pretty loud," and that there then were at least twenty people in the cafeteria, including patients, visitors and other employees.[5] Medrano did not yell anything. Herrera accompanied Durham to his office where Durham showed him a copy of the dress code policy. Herrera saw its non-adornment provision, took the

---

[4] See note 3 *supra*. About 7:30 that morning Medrano's supervisor, Leslie Bee, had asked him to take off the "Union Yes" button and Medrano had complied.

[5] Durham testified Herrera "got upset," "very disrespectful and almost to the point of being hostile." Medrano, who testified he was such good friends with Herrera he would consider him like a brother, indicated that Herrera seemed angry, but on cross-examination by his attorney said Daniels and Durham seemed angry before, and more angry than, Herrera did.

7

"Union Yes" button off and gave it to Durham who gave it back to Herrera telling him to go back to work and not wear it again, to which Herrera agreed. No discipline or punishment was imposed. Herrera then returned to the patient room he had been working on and, using the telephone there, called the Union president and told him what had happened. The president told him to put the button back on, which Herrera did and went back to work in the area wearing it, though he knew that to be in violation of the dress code policy and Durham's instructions. Not long thereafter, Durham came by and saw Herrera in the seventh floor hallway, where he was working, and asked him to remove the button, but Herrera refused.[6] Durham told him to come to his office after lunch. Herrera did so after calling the Union president, who (along with somebody else from the Union) accompanied him to Durham's office. Durham proceeded to suspend Herrera without pay for three days.[7] No discipline was imposed on Medrano.

The uncontradicted trial evidence reflects that the only "Union Yes" buttons worn by any employee at the Hospital were those

---

[6] While that transpired the other workers in the area stopped what they were doing and watched.

[7] The three days lost wages totaled $292.32. The next month when raises were fixed for 2000, Herrera, because of what transpired in respect to his wearing the "Union Yes" button, received only a 3% raise over his 1999 compensation, rather than the usual 4%. That one percentage point differential amounted to $256.53.

worn on November 11, 1999, by Herrera and Medrano.[8] And, there was no evidence that any other buttons or items contrary to the terms of the non-adornment policy – apart from the above noted once a year exceptions for high school football team insignia, Great American Smoke Out and blood donors – were ever worn by Hospital employees while on duty. The Hospital would not allow, for example, employees to wear on their uniforms at work "Union No" buttons, or Republican buttons or Democrat buttons or buttons endorsing a person running for election to the Hospital's board of directors.[9] There was neither any evidence nor any determination that the uniform non-adornment policy was motivated by any anti-union animus or was discriminatorily enforced. Herrera, who continued to be employed at the Hospital, testified at the October 2002 trial that "for about three years now" he had been trying to organize a Union in the Hospital by talking to people there during his work day, that he was doing that now, just like he always had, and that the Hospital had never stopped him from doing so. He

---

[8] Medrano testified that other than Herrera and himself he had never seen any employee wear a Union button at the Hospital, that in the months preceding November 11, 1999 he would see Herrera several times a day every day at work and never saw him wearing a Union button on his uniform before November 11, 1999, and that November 11, 1999, was the first (and only) time Medrano wore a Union button at work. None of the testimony of Herrera or the local Union president, or any other witness, was to the contrary. David Meisell, the Hospital's Executive Director of Human Resources, testified without objection that "[t]he 'Union Yes' button was only worn on November the 11th."

[9] In May 2000 the local Union president ran unsuccessfully for a position on the Hospital's board of directors.

also testified that he did not believe that Durham had singled him out at any time because of his Union involvement. The local Union president testified he knew of no instance when the Hospital prevented an employee from joining the Union. Executive Director of Human Resources Meisell testified that the Hospital's records do not reflect whether an employee is or is not a Union member and that Meisell was neutral as to employee Union membership, neither encouraging nor discouraging it.[10]

Durham, whose department had ultimate supervision over plumbers, electricians, painters, carpenters, general maintenance staff and plant staff, testified that all these employees have "some contact with the public," and that, among other things, plumbers and electricians worked in patient occupied rooms when a

---

[10] Meisell recognized that Texas law prohibited the Hospital from recognizing the Union or collectively bargaining with it. *See* Tex. Gov. Code § 617.002, providing that a political subdivision "(a) . . . may not enter into a collective bargaining contract with a labor organization regarding wages, hours, or conditions of employment of public employees" and "(c) . . . may not recognize a labor organization as the bargaining agent for a group of public employees." *See also id.* § 617.003(a) ("Public employees may not strike or engage in an organized work stoppage . . ."); § 617.004 (public employment may not be denied because of "membership or nonmembership in a labor organization"). Under § 617.005 the foregoing provisions do not impair the right of public employees to present work related grievances "either individually or through a representative that does not claim the right to strike"; however, that provision merely gives an individual employee the right to be represented at a grievance by anyone *he chooses,* it neither gives any preference to any union (whether or not the employee is a member thereof) nor authorizes the political subdivision to enter into any contract with a union. *Moreau v. Klevenhagen*, 956 F.2d 516, 520 (5th Cir. 1992), *aff'd*, 113 S.Ct. 1905, 1909 n.10 (1993).

plumbing or electrical problem is reported there. He testified that carpenters work "throughout the facility," "working right adjacent to patients that are right next door" as was the case with the work Herrera was doing November 11, 1999, on the seventh floor. Meisell testified that expectant patients frequently walked up and down the hall on the seventh floor "trying to encourage" labor and that "[y]ou also have a tremendous number of visitors" on that floor. Durham also explained that the dress code policy "provides a consistent standard for all the employees to provide neat and professional appearance for patients and staff." Herrera testified that he normally took both his breaks and his lunch in the cafeteria, that he worked "all around the hospital," "in the patient areas most of the time" where "there are usually patients in the rooms next to where" he was working, and where he, patients and visitors would be walking up and down the hallway. Medrano testified that in the course of his plumbing work at the Hospital he was in front of patients and the public "quite often," that when he went to work in a patient's room "the patient is in the room" (although "sometimes" that was not the case).[11]

Meisell, the Hospital's Executive Director of Human Resources, testified that all of the Hospital's employees are advised as to

---

[11] It was also undisputed that carpenters and plumbers (including Herrera and Medrano), and presumably similar employees, would from time to time in the course of their work leave the Hospital premises (in uniform) to purchase (at Hospital expense) items needed in their work from various local third party suppliers (for example, a lumber yard).

11

their contact with the public because "it's so important that the hospital maintain a human face to our patients." He stated that "[a]ll our employees are public employees" and are "expected to have positive contact with the public." He noted that for over ten years the Hospital has

> "had a program called Many Caring Hands where we teach our employees to go the extra mile. When a visitor is in the facility and needs some help finding the staff lab, to go in and get some blood work, they may not be able to find it. Even though it's not a carpenter's job necessarily to show people directions, it would be absolutely an expectation that the first person – the first employee that that person encounters helps that person to find the stat [sic] lab or radiology or whatever the case may be."

Meisell, as did Durham, expressed the view that allowing on-duty employees to wear "Union Yes" buttons on their uniforms would give rise to "disruption" that "would be constant and ongoing," stating

> "If some employees got to wear a "Union Yes" button and other employees wouldn't get to wear "Union No" buttons and there's the seed of conflict, dispute, disruption, we – that's not the kind of thing we need to be played out inside the halls of the hospital where we have patients dealing with life threatening conditions."[12]

---

[12] Both Meisell and Durham testified they were aware of "tension" among employees – including those under Durham and others, including housekeeping, dietary and business office employees – respecting union membership which tended to divide employees into two groups and split some friendships (including one of Herrera's). Meisell testified that he had heard arguments among housekeeping employees and seen "people cry . . . being fearful over being caught between these issues." A housekeeping employee told Meisell she was scared she would be asked to join the Union; Meisell (without asking who solicited her) told her it was entirely up to her, as he also said to a business office employee who told him he felt uncomfortable about being solicited to join the Union.

12

He went on to explain:

> "The union pins then identify those who are part of the
> union and we would then give the right to those who want
> to protest the union to wear an anti-union pin and
> therein lies the seat of that conflict and disruption
> that we try to avoid in the hospital setting. . . . If
> the employees are allowed though [sic; to] wear the union
> pin, then we have to allow other employees to wear a non-
> union pin. If these kinds of political issues are aired
> out in the halls of our hospital, then we have other
> political issues. A terrible kind of an argument would
> be to have a pro abortion, anti-abortion issue be argued
> in the midst of our hospital. That's not the setting to
> have – we're trying to provide health care, not to have
> a dispute over politics. We don't need to have the
> democrats and the republicans arguing in the halls of our
> hospital as we're trying to provide care to the people
> who are needing our life-saving services."

**Discussion**

*General Standards*

With respect to restricting the speech of its employees "the
government as employer indeed has far broader powers than does the
government as sovereign," *Waters v. Churchill*, 114 S.Ct. 1878, 1886
(1994); *Garcetti v. Ceballos*, 126 S.Ct. 1951, 1958 (2006), so that
"many of the most fundamental maxims of our First Amendment
jurisprudence cannot reasonably be applied to speech by government
employees" and "[e]ven something as close to the core of the First
Amendment as participation in political campaigns may be prohibited
to government employees." *Waters* at 1886 (citing *Broadrick v.*

There was no evidence of any actual physical altercation at the
Hospital respecting Union membership nor (except for the above
recited events of November 11, 1999) of any clear threat of such.

13

*Oklahoma*, 93 S.Ct. 2908 (1973) and *Civil Service Comm'n v. Letter Carriers*, 93 S.Ct. 2880 (1973)).[13] By the same token, Supreme Court decisions "have given substantial weight to government employers' reasonable predictions of disruption, even when the speech involved is on a matter of public concern, and even though when the government is acting as sovereign our review of legislative predictions of harm is considerably less deferential." *Waters* at 1887 (citing, *inter alia*, *Connick v. Myers*, 103 S.Ct. 1684 (1983), and *Letter Carriers*). *See also Boards of County Comm'rs v. Umbehr*, 116 S.Ct. 2342, 2348 (1996) ("We have . . . 'consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large.'") (quoting *Waters* at 1887).

On the other hand, the Supreme "Court has made clear that public employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern."

---

[13] *See also Kelley v. Johnson*, 96 S.Ct. 1440, 1445 (1976) ("[W]e have sustained comprehensive and substantial restrictions upon activities of both federal and state employees lying at the core of the First Amendment," citing *Letter Carriers* and *Broadrick*); *Wachsman v. City of Dallas*, 704 F.2d 160 (5th Cir. 1983) (local employees, non-partisan candidate elections); *Burrus v. Vegliante*, 336 F.3d 82, 86, 89 (2d Cir. 2003) (1993 Hatch Act amendments).

14

*Garcetti*, 126 S.Ct. at 1957. As the Court went on to explain in

*Garcetti*:

> "*Pickering* and the cases decided in its wake identify two
> inquiries to guide interpretation of the constitutional
> protections accorded to public employee speech. The
> first requires determining whether the employee spoke as
> a citizen on a matter of public concern. [citation] If
> the answer is no, the employee has no First Amendment
> cause of action based on his or her employer's reaction
> to the speech. [citation] If the answer is yes, then the
> possibility of a First Amendment claim arises. The
> question becomes whether the relevant government entity
> had an adequate justification for treating the employee
> differently from any other member of the general public.
> [citation] This consideration reflects the importance of
> the relationship between the speaker's expressions and
> employment. A government entity has broader discretion
> to restrict speech when it acts in its role as employer,
> but the restrictions it imposes must be directed at
> speech that has some potential to affect the entity's
> operations." *Garcetti*, 126 S.Ct. at 1958.

*See also Connick*, 103 S.Ct. at 1687 (quoting *Pickering*, 88 S.Ct. at

1734, as to seeking "'a balance between the interests of the

[employee], as a citizen, in commenting upon matters of public

concern and the interest of the State, as an employer, in promoting

the efficiency of the public services it performs through its

employees.'").

*The Balancing Process*

When a governmental employer disciplines an employee for

speaking "as a citizen addressing a matter of public concern, the

First Amendment requires a delicate balancing of the competing

interests surrounding the speech and its consequences." *Garcetti*

at 1961. In that situation, as *Connick* explains,

15

". . . the state's burden in justifying a particular discharge varies depending upon the nature of the employee's expression. Although such particularized balancing is difficult, the courts must reach the most appropriate possible balance of the competing interests." *Id*. at 1692.

. . .

"We caution that a stronger showing [by the governmental employer] may be necessary if the employee's speech more substantially involved matters of public concern." *Id*. at 1692-93.

Moreover, the governmental employer's burden in the balancing process is reduced not only by the extent to which the employee's speech is less than substantially on a matter of public concern but also by the extent to which the employer's challenged speech restriction is limited or minimal. Thus, in *Department of Justice v. FLRA*, 955 F.2d 998 (5th Cir. 1992) ("*FLRA*"), in holding that the Immigration and Naturalization Service's uniform anti-adornment policy validly precluded border patrol agents from wearing union buttons on their uniforms at work, we assumed, without deciding, that wearing the buttons constituted speech on a matter of public concern. *Id*. at 1006. We applied *Pickering* balancing, stating

"'[T]he State's burden in justifying a particular [action or policy] varies depending upon the nature of the employee's expression.' *Connick [v. Meyers]*, 461 U.S. [138] at 150, 103 S.Ct. at 1692 [(1983)]. 'The more central a matter of public concern the speech [or association] at issue, the stronger the employer's showing of counter-balancing governmental interest must be.' *Coughlin [v. Lee]*, 946 F.2d [1152] at 1157 [5th Cir. 1991]." *Id*. at 1006.

In applying the balancing we specifically relied, *inter alia*, on

16

the fact the uniform anti-adornment policy's preclusion of wearing

Union buttons on agent uniforms at work:

> ". . . results in only a minimal intrusion of the free speech rights of union employees. They can continue to express their support for the Union in myriad other ways that are absolutely unaffected by our decision today. Consequently, the INS anti-adornment policy does not violate the agents' First Amendment rights." *Id*. at 1007.

Thus, in *FLRA* we upheld application of the anti-adornment

policy to preclude wearing union pins at work even though "the INS

has not demonstrated with anecdotal evidence" that "deleterious

effects will in fact occur if agents are allowed to wear the pins,"

stating that under *Connick* "it is not necessary 'for an employer to

allow events to unfold to the extent that the disruption . . . is

manifest before taking action.'" *FLRA* at 1007 (quoting *Connick*, 103

S.Ct. at 1692).


*Matter of Public Concern*

With respect to whether an employee's speech addresses a

matter of public concern we consider the speech for which the

employee was disciplined – here, wearing a "Union Yes" button on

the employee's uniform while at work at the Hospital – *not* some

other speech. *Waters*, 114 S.Ct. at 1891. "Whether an employee's

speech addresses a matter of public concern must be determined by

the content, form, and context of a given statement." *Connick*, 103

S.Ct. at 1690. And, we have stated that a communication "rises to

17

the level of public concern if a person speaks *primarily* as a citizen rather than as an employee." *Dorsett v. Bd. of Trustees State Colleges & Universities*, 940 F.2d 121, 124 (5th Cir. 1991) (emphasis added).

As we did in *FLRA*, we make the not illogical assumption that Herrera's and Medrano's wearing of the "Union Yes" button on their uniforms while at work at the Hospital constituted speech on a matter of public concern. However, we conclude that that speech touched upon or involved matters of public concern only insubstantially and in a weak and attenuated sense. Several considerations taken together lead us to this conclusion.

To begin with, it cannot reasonably be said that a Hospital employee's wearing the "Union Yes" button on his uniform while at work communicates anything more than the implicit assertion that the employee is a union member and believes working conditions and/or compensation would be better for him, and perhaps for most fellow employees, if more Hospital employees were union members. However, a governmental employee's expression of general dissatisfaction with his working conditions does not normally constitute a matter of public concern. We do not "presume that all matters which transpire within a government office are of public concern" and "the First Amendment does not require a public office to be run as a roundtable for employee complaints over internal office affairs." *Connick*, 103 S.Ct. at 1691.

18

We recognize that in other contexts governmental employee buttons supporting union membership may more substantially speak to matters of public concern. For example, under the Federal Service Labor-Management Relations Statute (FSLMRS), 5 U.S.C. § 7101-7135, which was applicable in our above cited decision in *FLRA*, unions which have won an election supervised by the Federal Labor Relations Authority are certified as the exclusive bargaining agent of all the employees in the unit, and the agency is under the legal duty to bargain collectively with the union (subject to certain reserved management rights). See, e.g., 5 U.S.C. §§ 7111, 7114, 7116. *Cf. Scott v. Meyers*, 191 F.3d 82 (2d Cir. 1999) (indicating that under state law collective bargaining contract between union and local governmental entity employer subject to approval by employee vote). However, under Texas law political subdivisions may *not* contract with unions respecting employee wages, hours or conditions of employment *nor* may they "recognize" a union as bargaining agent for employees, and there are no union "elections" among such employees. See note 10, *supra*. Thus, the union buttons here were clearly *less* substantially speech on a matter of public concern than were the union buttons before us in *FLRA*.

We also observe that the speech at issue here does not in any way imply that the Hospital was guilty of any wrongdoing or breach

19

of trust or the like.[14]

Finally, the form and context of the speech here lack those characteristics which clearly point in the direction of classifying the speech as being on a matter of public concern.  This speech is not made in any kind of traditional public forum such as, for example, the teacher's letter to the newspaper criticizing the school board's finance proposals involved in *Pickering*, or the teacher's legislative testimony supporting a position opposed by his college's governing board involved in *Perry v. Sindermann*, 92 S.Ct. 2694, 2696 (1972), or even wearing the button at a meeting of the Hospital's board (or at any other kind of a public meeting held for the purpose of communicating views).  Nor was the "speech" here equivalent to a comment, made in private conversation between two friends, explicitly expressing a particular opinion on a specific matter of undisputed public concern, such was involved in *Rankin v. McPherson*, 107 S.Ct. 2891 (1987).  On the contrary, to the extent that the wearing of the button violated the uniform anti-adornment policy, the wearing of the button – the speech here – occurred *only* while the employee was on duty and "on the clock" at the Hospital and *in its* uniform.  In *Connick* the Court observed that the employee circulated the offending document at work and noted that

---

[14] *See, e.g.*, *Connick*, 103 S.Ct. at 1690-91, where, in holding that most of the employee speech at issue was not on a matter of public concern, the Court noted that it did not "seek to bring to light actual or potential wrongdoing or breach of public trust . . .".

20

"Employee speech which transpires entirely on the employee's own time, and in nonwork areas of the office, bring different factors into the *Pickering* calculus, and might lead to a different conclusion." *Connick*, 103 S.Ct. at 1693 n.13. Indeed, to the extent that the "speech" at issue here communicated anything to anybody it did so *only* as an *incident* to the button wearer's on the clock performance of his duties as a Hospital employee in the Hospital's uniform. That would facially appear to be some reasonable justification for the governmental employer to treat such employee speech "differently from" speech by "any other member of the general public." *Garcetti*, 126 S.Ct. at 1958. While this is not the same case as *Garcetti*, some of the observations there likewise clearly have relevance, though perhaps not determinative significance, here, viz:

> "Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen.
>
> . . .
>
> When he went to work and performed the tasks he was paid to perform, [plaintiff] Ceballos acted as a government employee. . . ." (126 S.Ct. at 1960).
>
> . . .
>
> "Employees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government. The same goes for writing a letter to a local newspaper, see *Pickering*, 391 U.S. 563, 88 S.Ct. 1731, or discussing politics with a co-worker,

21

see *Rankin*, 483 U.S. 378, 107 S.Ct. 2891." (126 S.Ct. at 1961).[15]

*Employer Interest*

We think it evident that the Hospital has a significant interest in having a uniform non-adornment policy applicable to its employees, including those in its Integrated Services organization, such as carpenters, plumbers, electricians, housekeeping and general maintenance.

That uniforms may be more important in law enforcement than in other fields clearly does not mean that other employers have no interest in requiring them. We agree with the Ninth Circuit's observation in *INS v. Fed. Labor Relations Auth.*, 855 F.2d 1454 (9th Cir. 1988), that a "uniform requirement fosters discipline, promotes uniformity, encourages *esprit de corps*, and increases readiness" and having "*standardized* uniforms encourages the subordination of personal preferences and identities in favor of the overall group mission." *Id*. at 1464 (citations and internal quotations omitted). There is no reason to believe that a uniform requirement will not have somewhat similar efficiency enhancing

---

[15]   *See also United States v. National Treasury Employees Union*, 115 S.Ct. 1003, 1013 (1995), where the Court held that certain speeches and articles, by non-senior level government employees, unrelated to the employee's duties or status, constituted "citizen comment on matters of public concern" *because* they "were addressed to a public audience, were made outside the workplace, and involved content largely unrelated to their government employment." Here the last two "public concern" factors are essentially wholly absent and the first is largely so.

22

effects in the non-law enforcement context, as is clearly attested by the presence of uniforms in so many non-law enforcement occupations, e.g., postal employees, bus drivers, flight attendants, United Parcel Service personnel and a host of others. Uniforms also serve to provide a neat and professional appearance to members of the public served by the employer, here Hospital patients and visitors, and to allow patients and visitors to identify the employees as being such. Obviously, when a Hospital plumber, electrician, or housekeeper comes into a patient occupied room, or when a Hospital carpenter is observed by a patient or visitor in the hall, it is also highly desirable that the employee be easily identifiable as such by, as well as present an appropriate appearance to, that patient or visitor.

Moreover, we agree with *INS v. Fed. Labor Relations Auth. supra*, that "[t]o allow employees to adorn their uniforms with objects of their own choosing undermines the very purposes that uniforms serve." *Id*. at 1464. If each employee "uniform" were to be festooned with whatever button or buttons the wearing employee desired, it would obviously no longer be a "uniform" in any meaningful sense.[16]

While this, again, is doubtless of most importance in a law

---

[16] We recognize that the district court's judgment only required the Hospital to allow the wearing of "pro-union buttons". While this presents problems of its own, as explained below, we note here that no limit is stated on the number or size of the buttons which the judgment requires the Hospital to allow.

enforcement context, there is no reason to believe it is not of real significance in most of the many non-law enforcement contexts, both governmental and civilian, where uniforms are appropriately required.  As stated in *INS v. Fed. Labor Relations Auth. supra*,

> ". . . the management interest in requiring unadorned uniforms has been recognized in private sector cases as well.  The Sixth Circuit has recognized that concerns over discipline and presenting a clean professional image justified a private employer in prohibiting its restaurant employees from wearing unauthorized union buttons on their official uniforms. *Burger King v. NLRB*, 725 F.2d 1053, 1055 (6th Cir. 1984).  Similarly, in *Harrah's Club*, we recognized that a private employer was justified in prohibiting its casino employees from wearing unauthorized union buttons on their official uniforms. *See [NLRB v.] Harrah's Club*, 337 F.2d [177] at 178-79 [(9th Cir. 1964)]." *Id*. at 1465.

In *FLRA* we held that it was not unreasonable for the INS, in the absence of specific anecdotal evidence, to nevertheless assume there was a degree of schism between union and nonunion agents, that allowing that "to manifest itself in the form of a pin on the uniforms of the pro-union agents will create added tension," and that "there will be occasions when a union button can be interpreted as a symbol of defiance against supervisors and as a split in solidarity among union and non-union agents, which will have an impact on mission, discipline and esprit de corps." *Id*., 955 F.2d at 1007.  There is no good reason to believe that these observations are not also essentially applicable here.  Indeed, the evidence here showed that there was some workplace tension among Hospital employees as to union membership, that for some at least

24

it was an emotional subject, and that the tension likely would be exacerbated by employees wearing "Union Yes" buttons on their uniforms at work. And this would be the case to an even greater extent were the Hospital to also allow – as indeed it would plainly have to – the similar wearing of "Union No" buttons.

But the concerns are not limited to "Union Yes" or "Union No" buttons. Speech on labor related issues may *not* be privileged over speech on other issues of public concern, *Police Dep't of City of Chicago v. Mosley*, 92 S.Ct. 2286 (1972), for to do so would "undercut the 'profound national commitment to the principle that debate on *public issues* should be uninhibited, robust, and wide-open.'" *Id*. at 2290 (emphasis added) (quoting *N.Y. Times Co. v. Sullivan*, 84 S.Ct. 710, 721 (1964)); *Carey v. Brown*, 100 S.Ct. 2286, 2291 (1980). If "Union Yes" – and/or "Union No" – buttons are allowed, so must employees be allowed to wear on their uniforms at work buttons addressing other topics of equal or greater public concern, such as, for example, "Abortion is Murder," "No Gay Marriage," "Deport Illegals Now" and the like. Common sense tells us, and the testimony confirms, that this would plainly be deleterious to the Hospital's mission.[17] As the Court observed in *Carey*, the Constitution does not leave governmental units powerless

---

[17] At the very least, in its capacity as employer, the Hospital must have the power to avoid such First Amendment hostile, and essentially impractical, picking and choosing among matters of public concern in respect to its uniform anti-adornment policy applicable only to employees while on duty.

25

to protect the public from that which "'disturbs the tranquility of . . . buildings that require peace and quiet to carry out their functions, such as courts, libraries, schools and hospitals.'" *Id*., 100 S.Ct. at 2295 (quoting with approval from Justice Black's concurrence in *Gregory v. Chicago*, 89 S.Ct. 946, 950 (1969)). Moreover, the Hospital's patients – and their families – are in the nature of a captive, and essentially involuntary, audience with respect to whatever message is conveyed by buttons on the uniforms of on-duty Hospital employees. It is reasonable for the Hospital to conclude that its service to patients and their families is enhanced by their not being involuntarily subjected to having messages on matters of public concern indiscriminately conveyed to them on the uniforms worn by on duty Hospital employees.

## Conclusion

The Hospital's anti-adornment policy, so far as it touches matters of public concern, is wholly content and viewpoint neutral. Indeed in any realistic, practical sense it is simply neutral.[18]

---

[18] The policy's stated exceptions for pins representing professional degrees or credentials (e.g., BS degree in nursing) and years of service are not matters of public concern and are typical of items often considered as *part of,* not something extraneous to, a uniform. The twice a year exceptions for the Great American Smoke Out day and Hospital blood donors, each closely related to the Hospital's mission, are similarly not matters of public concern. Once a year pins for the local high school football game likewise pertained to no matter of public concern. Courts routinely disregard such trivial exceptions to uniform anti-adornment policies. *See, e.g., INS v. Federal Labor Relations Auth.*, 855 F.2d at 1465; *Burger King v. NLRB*, 725 F.2d 1053, 1055 (6th Cir. 1984). The undisputed evidence is that these

26

Moreover, there is no evidence that the policy was adopted or maintained out of any anti-union animus or was enforced other than fairly and neutrally.  And, the policy concerns only what employees may wear on their work uniform while at work, and hence regulates them only in their capacity as employees, not in their capacity as private citizens.  No decision of the Supreme Court or of this court has ever invalidated such a uniform anti-adornment policy. The basic thrust of the Supreme Court's *Pickering* line of cases has been "to ensure that public employers do not use authority over employees to silence discourse . . . simply because superiors *disagree with the content* of employees' speech."  *Rankin*, 107 S.Ct. at 2897 (emphasis added).  Obviously, in *Rankin* the employee, fired for saying "if they go for him again, I hope they get him" concerning the shooting of the President, would *not* have been fired had she said "I hope he quickly recovers."  The firing was because of disagreement with the *viewpoint* expressed.  That was likewise so in all the Supreme Court's *Pickering* line of cases striking down employer discipline for employee on the job or job related

---

minor exceptions raised none of the concerns which would be raised by buttons addressing matters of public concern.  *Cf. Hill v. Colorado*, 120 S.Ct. 2480, 2493, 2502 (2000) (statute that "does not distinguish among speech instances that are similarly likely to raise the legitimate concerns to which it responds" is content neutral and valid time, place, and manner restriction, notwithstanding covering "'protest, education, or counseling'" speech but not inquiries about the time of day or bus schedules).

expressions.[19]  A strong argument can be made that governmental employer genuine and essentially neutral uniform anti-adornment policies, administered without discrimination, applicable only to employees while on duty, will of themselves almost always pass *Pickering* balancing, as they concern what is essentially a part of the employees' normal job performance for the employer and at the same time result in only the most minimal intrusion into employee free speech rights, leaving full scope for employee expression on any subject.  Nevertheless, to decide the present case we need not, and do not, resolve the ultimate, across-the-board, merits of such a general argument.  Among other things, it is, perhaps, possible that there are public employers for whom a uniform, or an anti-adornment, policy does not conceivably subserve any legitimate

---

[19]    *See, e.g., Pickering*, 88 S.Ct. 1731, 1732-33 (1988) (teacher's letter to newspaper criticizing Board of Education's school finance proposal); *Perry*, 92 S.Ct. 2694, 2696 (1972) (college teacher's legislative testimony supporting position opposed by college's board of regents); *Mt. Healthy City School District v. Doyle*, 97 S.Ct. 568, 573 (1977) (teacher's telephone call to radio station conveying substance of memorandum relating to teachers' dress and appearance and "his criticism"); *Givhan v. Western Line Consolidated School Dist.*, 99 S.Ct. 693, 695 (1979) (teacher's criticism to principal of school district's racially discriminatory policies and practices); *Connick*, 103 S.Ct 1684, 1693 (1983) (assistant district attorney's questionnaire circulated in office which impliedly criticized district attorney and supervisors); *Waters*, 114 S.Ct. 1878, 1884 (1994) (nurse's criticism of employer hospital's violation of state nursing regulations and the quality of nursing care provided patients).
    Where, however, the employer restrictions apply to expression which *neither* takes place on the job *nor* is in any way job related, then the neutrality of the regulation does not suffice to sustain it.  *National Treasury Employees Union*, 115 S.Ct. 1003 (1995).

employer purpose.  Here, however, we hold that as a matter of law the *Pickering* balance favors the Hospital, which may legitimately conclude that its uniform non-adornment policy furthers its mission by neutrally fostering a tranquil and peaceful, as well as a neat, clean and care focused, atmosphere for its patients and visitors.[20]

Having concluded that as a matter of law the *Pickering* balance weighs in favor of the Hospital, we reverse the judgment below and remand the case with directions to enter judgment in favor of the Hospital.

REVERSED and REMANDED with directions

---

[20]  On the other side of the ledger, under the policy the employees here remained fully free to otherwise meaningfully express whatever message wearing particular buttons at work would convey.  And, as to the "Union Yes" buttons here, they do not strongly involve a matter of public concern, particularly given the very limited role of unions in relation to Texas governmental employers and employees (see note 10 *supra*).

WIENER, Circuit Judge, dissenting, joined by DeMOSS, STEWART, and DENNIS, Circuit Judges.

Despite the utmost esteem in which I hold my colleagues of the en banc majority, I am constrained to dissent. In my view, the majority:

> (1) Understates how substantially Herrera's speech in this case involves matters of public concern;
>
> (2) Overstates the significance of the anti-adornment facet of the employer's uniform policy in advancing the Hospital's interest in workplace efficiency;
>
> (3) Ignores some factors pertinent to Herrera's individual speech interest, and undervalues others, when conducting the Connick/Pickering balancing test;
>
> (4) Inadequately distinguishes the facts and circumstances peculiar to this civilian employer/ maintenance-crew employee case from those of the cases proffered as analogs by the majority, involving (a) law enforcement and paramilitary employees, and (b) other sensitive- or confidential-relationship employers;
>
> (5) Fails to parse the Hospital's total employee pool and focus only on the sub-group of non-healthcare, blue-collar custodial, maintenance, food preparation, and clerical workers for the purpose of weighing the competing interests of free speech and workplace efficiency;
>
> (6) Obverts the effect Texas's prohibition of a public employer's recognition of a union and bargaining collectively with it;
>
> (7) For good measure, tosses out a parade of horribles that it speculates would result from a holding in favor of Herrera.

Mindful of the imperative to "keep one's eyes upon the doughnut and not upon the hole," I caution all to remain constantly aware that it is not the Hospital's uniform policy vel non that Herrera violated; he wore the prescribed uniform at all times.

Rather, it is the Hospital's additional prohibition of the wearing of any _adornment_ on those mandatory uniforms —— _as that restriction is applied_ to Herrera and his fellow custodial and clerical co-workers —— that infringes his First Amendment right to freedom of expression.

1.

Herrera's Speech and "Matters of Public Concern"

As the majority ultimately acknowledges that Herrera's expression did indeed address a matter of public concern, I need not comment on each incremental step taken (or not taken) to reach this unavoidable conclusion. I am compelled, however, to flag the majority's "damning with faint praise" the _degree_ of public concern that Herrera's workplace speech exhibited.

a.   _Public Concern or Personal Interest?_

First, the majority advances that, because Herrera's speech occurred in the workplace and was at least implicitly related to his employment, it _primarily_ concerned matters of his own "personal interest." I must take issue with this bit of overbroad mis-direction:   We have expressly held that speech may warrant protection, even if it occurs _only_ in the workplace.[1]   And, it is

---

[1] See _Branton v. City of Dallas_, 272 F.3d 730, 740 (5th Cir. 2001) (noting generally that "[n]either the [First] Amendment itself nor our decisions indicate that . . . freedom [of speech] is lost to the public employee who arranges to communicate privately with his employer rather than to spread his views before the public.") (citing _Givhan v. W. Line Consol. Sch. Dist._, 439 U.S. 410, 415-16 (1979)).

a given that at least a modicum of personal interest will inhere in virtually all employee speech, regardless of whether uttered while the speaker is on or off the clock.  Herrera concededly had some individual interest in supporting the union organizing drive when he wore the "Union Yes!" button on his uniform.  But —— at least on this record —— he cannot be held to have had any more of a personal stake in the organizing effort than any other similarly situated employee of the Hospital.  That he was one of the organizers makes no difference.

In holding that Herrera's personal interest predominated over the public concern that he addressed, the majority focuses too narrowly on what it perceives to be the motivation for his speech, ignoring his obvious and overarching institutional interest in the hoped-for result of the union organizing effort at this <u>public</u> facility.  Such public concern, either pro or con, was shared, I venture, to a greater or lesser degree, by (1) the subset of all of the Hospital's non-healthcare, custodial and clerical workers, (2) the Hospital's entire workforce, (3) the healthcare establishment of the entire area, including but not limited to patients and their families, and (4) the community at large.  In addition to its potential effect on the compensation, benefits, and working conditions of Hospital employees, a successful union organizing effort would predictably (1) produce fluctuations in the costs of services and changes in the kinds of services offered at the Hospital, and (2) increase political pressure from the public to

32

satisfy hospital workers' demands.  Herrera's pro-union speech, therefore — irrespective of an inevitable bit of personal motivation — much more directly and substantially addressed a "matter of public concern" than the majority is willing to acknowledge.  Yet, courts that have considered the question have uniformly held that <u>speech regarding union activities is almost always speech on a matter of public concern</u>.[2]  The majority's subtle trivializing of Herrera's speech as involving matters of public concern "only insubstantially and in a weak and attenuated sense"[3] finds no justification in this record.

b.    <u>State Law Proscription of Recognizing Unions</u>

The majority further suggests that any public-concern aspect of Herrera's pro-union speech is largely negated by the Texas statute that prohibits public agencies from recognizing or collectively bargaining with labor unions.[4]  As the majority sees it, this Texas law creates a crucial distinction between the

---

[2] <u>See, e.g.</u>, <u>Boddie v. City of Columbus</u>, 989 F.2d 745, 750 (5th Cir. 1993) ("[S]peech in the context of union activity will seldom be personal; most often it will be political speech."); <u>see also</u> <u>American Postal Workers Union, AFL-CIO v. United States Postal Serv.</u>, 830 F.2d 294, 301 (D.C. Cir. 1987) ("The urge to unionize certainly falls within the category of expression that is 'fairly considered as relating to any matter of political, social, or other concern to the community . . . .'") (quoting <u>Connick v. Myers</u>, 461 U.S. 138, 146 (1983).

[3] Maj. Op. at lines 412-13.

[4] <u>See</u> Tex. Gov. Code § 617.002.

33

instant case, and those like <u>Dep't of Justice v. FLRA</u>,[5] in which the union that prevailed in a federally-supervised election could be and was certified under federal law to act as the non-management employees' exclusive bargaining agent. As I interpret this proposition, the majority's flawed syllogism would go: (1) Unions organize to represent and collectively bargain for workers; (2) Herrera's union is prohibited by law from doing so; ergo, (3) public-sector employees can have, at most, only a weak and attenuated public concern with union organizing.

Logic dictates a diametrically opposed reasoning and result. Denied the right to be represented officially by a union in collective bargaining and other labor-relation issues, public-sector employees like Herrera would perceive themselves as having a <u>greater</u> need for a strong, collective voice in the arena of public opinion than do employees who can and do have unions as their direct advocates with the general public as well as with their employers. Rather than diminishing the degree of Herrera's public interest in this organizing effort, this state law prohibition greatly <u>increases</u> the public-interest aspect of Herrera's expression in support of the organizing campaign here.

Further, the interest of Texans in regulating (or not regulating) labor relations in the public sector is by no means lessened simply because the Legislature has chosen to be

---

[5] 955 F.2d 998 (5th Cir. 1992).

restrictive rather than inclusive as regards how government employers may deal with unions. Neither do Texas's restrictions on official recognition and collective bargaining equate with a lessening of the public's interest in union activity generally. Texas public employee unions, through collective action <u>in the political arena</u> —— such as airing grievances, staging demonstrations, picketing, attending open board or committee meetings, and such —— can and do function influentially as decidedly "public" actors. The larger community inevitably has a substantial interest in the activities of such unions, irrespective of their statutory inability to represent formally, or bargain collectively on behalf of, public employers' workers.

2.

<u>Connick/Pickering Balancing Process</u>

As noted, the majority ultimately concedes that Herrera's speech did involve a matter of public concern; and that his speech interest therefore must be balanced against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."[6] The Supreme Court has identified a number of factors to be considered in performing this balancing, including whether the employee's speech (1) impairs discipline by superiors or harmony among co-workers, (2) has a detrimental effect on those close working relationships for which

---

[6] <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563, 568 (1968).

35

personal loyalty and confidences are essential, (3) impedes the performance of the speaker's duties, or (4) interferes with the regular operation of the enterprise.[7]  Except for when a Hospital supervisor fomented confrontations and work interruptions, Herrera's silent, single-button expression had no deleterious effect on his supervisors' ability to enforce discipline or on his harmonious interaction with co-workers.  Unlike the enlisted ranks in paramilitary agencies or ADAs in a DA's office, Herrera's maintenance work was devoid of confidential relationships and requirements for "personal loyalties."  Neither did his work affect the quality or volume of the Hospital's efforts to accomplish its mission or interfere with the regular functioning of the Hospital, either in providing professional services or maintaining its building's operational condition.

Here, however, the majority eschews (or at least commingles beyond recognition) consideration of the elements of the Court's prescribed approach or those of any similarly detailed analysis of the real effect of Herrera's speech.  In its place, the majority confects an artificially inflated _efficiency_ interest for the Hospital, then proceeds to balance that overblown interest against the artificially minimized _speech_ interest — not Hererra's own, or even a hypothetical maintenance worker's, but that of _any_ hypothetical hospital worker.  Yet, even assuming for today's

---

[7] _Rankin v. McPherson_, 483 U.S. 378, 388 (1987)(a county constable/clerical employee case).

purpose that the majority reaches the correct result —— and I obviously do not believe that it did —— I still would have to question the validity of its methodology. More to the point, in creating and applying this methodology, the majority puts a judicial thumb on the Connick/Pickering scale by using trivializing modifiers to minimize Herrera's speech interests and aggrandizing modifiers to exaggerate the Hospital's efficiency interest.

a. <u>The Hospital's Efficiency Interest</u>

For example, by describing the public-concern element of Herrera's speech as being a matter of public concern "only insubstantially and in a weak and attenuated sense," the majority subtly tips the Connick/Pickering scales against Herrera's speech interest and in favor of the Hospital's efficiency interest. This obfuscation should not be allowed to relieve the Hospital of its burden of demonstrating an efficiency interest sufficiently high to justify its denial of Herrera's First Amendment rights. Yet the majority finds such a predominating interest <u>for</u> the Hospital, first by looking to non-adornment policy cases that it proffers as being similar to the one at issue here, then analogizing efficiency interests of the public employers in those cases to the Hospital's efficiency interest in requiring that <u>all</u> of its employees' uniforms be worn free of any items of adornment. In so doing, the majority erroneously equates the efficiency interests of the public employers in those other cases with the efficiency interest of the Hospital here.

Relying on that purportedly analogous case law should be unavailing: Those cases deal almost exclusively with government employers that are either (1) <u>military</u> units, <u>law enforcement</u> agencies, or <u>paramilitary</u> organizations; or (2) quasi-professional civilian agencies such as district attorney's offices and school boards.[8] Just as <u>INS</u> involved uniformed quasi-military Border Patrol agents and <u>Goldman v. Weinberger</u>[9] involved a conventional military unit, <u>Connick</u> implicated a district attorney's penumbral need to enjoy the absolute trust and confidentiality of his lawyer assistants, and <u>Pickering</u> addressed a school board's need for a heightened professional relationship with career teachers. Even <u>Rankin</u>, itself a law enforcement case, distinguished the special loyalty, confidentially, and discipline needs of a sheriff vis-à-vis his deputies and rejected the applicability of this efficiency-loyalty-discipline interest vis-à-vis a clerical worker —— an employee much more analogous to Herrera than to deputy sheriffs, Border Patrol agents, or assistant district attorneys.

Cases such as those relied on by the majority are at best minimally comparable to this one, if comparable at all. I readily acknowledge that <u>for law enforcement agencies</u> uniforms serve

---

[8] The majority relies most heavily on the Ninth Circuit's reasoning in <u>United States Dept. of Justice, Immigration and Naturalization Serv. v. Fed. Labor Relations Auth.</u>,["<u>INS</u>"], 855 F.2d 1454 (9th Cir. 1988), even though the Hospital's briefs cite numerous other cases.

[9] 475 U.S. 503 (1986).

employer interests in efficiency and esprit de corps. But such purposes are materially distinct from any efficiency interests that unadorned uniforms might conceivably serve for a public hospital in the context of its non-medical maintenance, food preparation, trash removal, and clerical staff. The majority acknowledges (grudgingly) only that "uniforms may be more important in law enforcement than in other fields"[10] — once again trivializing a differentiating distinction to support its suggestion that all public agencies, regardless of mission, share a virtually identical interest in requiring unadorned uniforms for every category of employee, regardless of function — just some to a slightly greater or lesser extent than others. Respectfully, this simply is not so.

b. Uniforms, Maybe; Items of Adornment, No

The majority signals its agreement with the Ninth Circuit's holding in INS,[11] by stating that (1) "a uniform requirement [not, I emphasize, a non-adornment requirement, which could apply to uniforms and mufti alike] fosters discipline, promotes uniformity, encourages esprit de corps, and increases readiness," and (2) having "standardized uniforms encourages the subordination of personal preferences and identities in favor of the overall group mission."[12] Thus, the majority muses, "there is no reason to

_____

[10] Maj. Op. at lines 514-15 (emphasis added).

[11] 855 F.2d at 1464.

[12] Id. (citing Goldman v. Weinberger, 475 U.S. at 508 ("[T]he traditional outfitting of personnel in standardized uniforms

39

believe that a uniform requirement will not have somewhat similar efficiency enhancing effects in the non-law enforcement context."[13]

I acknowledge the verity of this broad tautology, with its elastic use of "somewhat similar."  To it I must add, however, that, in the much more àpropos context of non-law enforcement, public employers like the Hospital, making the additional <u>non-adornment</u> facet of a uniform requirement equally applicable to maintenance and clerical workers as to doctors, nurses, therapists, etc. at most enhances efficiency "only insubstantially and in a weak and attenuated sense" —— to quote the majority.  The ineluctable fact is that (1) uniforms bearing only the employer-prescribed insignia are central and paramount to the core interests of military and law enforcement agencies; but (2) having Herrera and his subset of workers wear no adornments on their work clothes would contribute minimally, if at all, to such clearly secondary or tertiary interests of civilian institutions like hospitals.  And, again, we must remain consciously aware that it is not the uniform requirement <u>per se</u> that Herrera violated; rather, his free speech clashed with the Hospital's application of the non-adornment appendage of that policy to its custodial and clerical segment of staff.

---

encourages the subordination of personal preferences and identities in favor of the overall group mission.")).

[13] Maj. Op. at lines 523-25 (emphasis added).

40

Finally, the majority treats the Hospital's avowed interest in requiring maintenance workers to wear unadorned uniforms as though it were a natural extension of, or progression from, this and other courts' past validations of law enforcement agencies' efficiency interest in uniforms and thus in non-adornment. The majority might be comfortable with this non sequitur but, as I shall further demonstrate, in the discrete context of this case, such a leap does not bridge the gap between unadorned uniforms of military and law enforcement employees, and unadorned uniforms of the very distinguishable subset of blue-collar workers in a civilian public hospital.

c.   Efficiency

For openers, it appears to be lost on the majority that "efficiency" as a governmental employer's interest under Connick/Pickering, necessarily means different things in different settings. As previously observed, "esprit de corps," "readiness," and "subordination of personal preferences" are undoubtedly critical to the efficient and effective operations of law enforcement agencies —— as they likely are to the efficient functioning of a public hospital's operating rooms, ICUs, catheter labs, and emergency rooms. But where is there any contribution from esprit de corps or unquestioning responses to orders to the efficient operation of the Hospital's physical plant, file rooms, and cafeterias? Non-healthcare employees who work those areas, like the sheriff's clerk in Rankin, essentially fly beneath the

41

radar and perform tangential support functions that are subordinate to and separate from the overarching healthcare mission of the Hospital. With respect, I urge that the majority overreaches when it stretches the Ninth Circuit's <u>INS</u> law-enforcement holding to cover the "somewhat similar" efficiency interest of the Hospital in applying its non-adornment uniform policy to Herrera. This distinction becomes undeniably telling when the majority finally addresses the Hospital's specific interest in maintaining an unadorned-uniform policy for its custodial and clerical workers —— an alleged interest that simply cannot be forced to resemble, even slightly, those of law enforcement or paramilitary agencies. Yet, as the majority flatteringly describes it, the Hospital finds it "highly desirable" for its maintenance workers to "be <u>easily identifiable</u> as such" and "present an <u>appropriate appearance</u>."[14] Even if, <u>arguendo</u>, such self-serving and conclusional protestations were to be credited, how could a single pro-union button lessen the ease of identifying Herrera as a maintenance worker or the propriety of his appearance?

This healthcare facility's interest, however logical and legitimate it may sound in a vacuum, is a far cry from the interests in esprit de corps, readiness, or unquestioning response to orders that courts have recognized as key to law enforcement agencies' speech-restricting anti-adornment regulations. But, even

---

[14] Maj. Op. at lines 535-37 (Emphasis added).

granting that a civilian hospital can somehow rationalize an abstract desirability of having its maintenance personnel wear identifying uniforms sans pins or patches, there is still just no way to equate the efficiency value of the non-adornment gloss that the Hospital has engrafted on its basic uniform policy with the indisputably greater value of prohibiting competing adornment on law enforcement and military uniforms. I agree that in cases of that type, addressing as they do law enforcement agencies and military units, uniforms that are required to be adorned with such employers' own functional insignia — chevrons, bars, leafs, stars, unit patches, and such — serve very real efficiency purposes within and without their ranks. Moreover, it is axiomatic that such function-serving items cannot abide the presence on such uniforms of competing or distracting insignia of the wearer's personal choice. Not so, however, for the monochromatic denims, dungarees, whites, or khakis required of custodial personnel, cafeteria workers, and file clerks, free, as they are, of any functioning insignia of rank, unit, or specialty. There simply can be no confusion or ambiguity when such otherwise insignia-less garb is "adorned" with a single pro-union button.[15] It defies logic to conclude that one such item on the otherwise unadorned work uniform

---

[15] Indeed, in Lubbock — or Midland or Odessa or and many other communities in this circuit — the partisan football supporters' buttons and stickers that the Hospital permits as one of several exceptions (thereby destroying its claim to the policy's neutrality), are more likely to cause rancor and confrontation than would even a union label in that right-to-work-state.

of an in-house carpenter, plumber, cafeteria worker, file clerk, electrician, or janitor could negatively affect any efficiency-enhancing function of their work dress — at least not in the real world.

    d.    <u>Herrera's Speech Interest</u>

As made clear by the Supreme Court in identifying <u>Rankin</u>'s four non-exclusive factors to be used in balancing the competing interests of a constable and his clerical staff, the weight afforded an employee's speech interest in the <u>Connick</u>/<u>Pickering</u> balancing process depends to a great extent on the peculiarities of not only the speech itself, but also on the specific work and job description of the individual employee/speaker within the government employer's operational structure. Stated differently, what's sauce for a public hospital's doctor or technician "goose" is not necessarily sauce for its carpenter or file-clerk "gander." The majority, however, appears disinclined to analyze how Herrera's particular expression might in reality affect the Hospital's accomplishment of its principal mission, as contemplated by the Supreme Court in <u>Rankin</u>. Had the majority dutifully conducted such an analysis, it just might have been compelled to conclude that the Hospital's policy prohibiting items of adornment on uniforms (with notable exceptions, I repeat) was unduly restrictive <u>as applied to Herrera</u> and his "Union Yes" button. Perhaps, then, it was to avoid this troublesome truth that the majority chose to make no personal

44

reference to Herrera (or to the separate subset of maintenance employees) in its evaluation of the competing interests to be balanced.  Instead, the majority globally lumps together all "Hospital employees," as though large segments (maintenance, janitorial, food preparation, clerical) are indistinct from other segments (health care specialists, medical and quasi-medical employees) for the purpose of assigning relative weights to such interests in the conduct of the <u>Connick</u>/<u>Pickering</u> balancing test. I need not labor longer to demonstrate the obvious flaw in the majority's approach.

    e.   <u>Blanket Application of Uniform Adornment Policy</u>

The majority makes much of its belief that the Hospital's non-adornment policy is content-neutral and therefore may be applied equally to all employees.  At first blush, a policy thus configured might appear to be desirable and expedient for public civilian hospitals; but if it is to survive a First Amendment challenge, it must do so on a highly individualized, case-by-case basis.  The majority incants this maxim, of course, but goes on to honor it only in the breach.  It fails to address the particular circumstances of this case, most notably among which is the fact that Herrera is a maintenance worker —— indistinguishable from his counterparts in virtually every functioning edifice, whether public or private —— who has some visibility but almost no direct interaction with hospital patients and their families, or, for that matter, with M.D.s, RNs, med techs, or executives in management

45

positions.  This framework must not be ignored or belittled when balancing Herrera's speech interest against the Hospital's interest in efficiency.  A hospital policy that is properly found to outweigh the adornment "speech" rights of doctors, nurses, LPNs, and technicians, as well as management executives, can at the same time be constitutionally outweighed by the free-speech rights of rank-and-file non-healthcare workers like Herrera.

The majority nevertheless tests the Hospital's non-adornment policy without distinguishing between such subsets of its work force and finds the policy appropriate for all employees, across the boards.  Such a conclusion may be reached legitimately only after a full and detailed consideration of every factor unique to the case under consideration, i.e., by recognizing that, when it comes to unadorned uniforms, there can be  "different strokes for different folks."  I refer in particular to the nature of Herrera's employment and job description, and the extent to which his kind of work —— and his appearance at work —— necessarily affects how much or how little weight should be given to his speech rights in this court's <u>de novo</u> conduct of the <u>Connick/Pickering</u> balancing process.

3.

<u>Broader Import of This Case</u>

Finally, the majority is quick to warn that, if we allow Herrera's pro-union speech to trump the anti-adornment aspect of the Hospital's uniform policy <u>as applied to Herrera</u>, this case could be just the tip of a free-speech iceberg that would threaten

46

the safe passage of many another government employer's tranquil vessel.  But this "horrible" just won't join the parade:  If the _Rankin_ approach is faithfully followed, the nature of an employee's speech and the context in which it is uttered will always consist of _case-specific_ factors that must be included in the free-speech calculus employed by courts faced with similar public workplace First Amendment challenges.  Obviously, the particular _Rankin_ factors of some kinds of speech by some categories of employees will carry more weight on the _Connick_/_Pickering_ balance beam than will others.  To suggest, however, that the approach and result I advocate in this case would produce a precedential pandemic infecting a multitude of civilian public employers with an onerous burden of tolerating any and all manner of on-the-job speech, is nothing more than hype.  This warning misapprehends the nature of the analysis that should be undertaken and exaggerates any potential precedential effect of our protecting Herrera's speech, as a non-paramilitary, non-professional laborer in the civilian sector of public service.  An objectively proper exercise of the balancing test will itself contain all the safeguards needed to avoid the scary results predicted by the majority.  Its present fears are far less than its horrible imaginings.

- - - - - - -

I am never completely free of discomfort when dissenting from colleagues in a three-judge panel, much less in the face of a supermajority of my colleagues sitting en banc.  This is especially

47

so when, as here, the majority opinion is penned by a jurist of Judge Garwood's preeminence and reputation. Nevertheless, for the foregoing reasons and those set forth in the panel majority opinion that was vacated to rehear this case en banc,[16] I must respectfully dissent.

---

[16] Communication Workers of America v. Ector County Hosp. Dist., 392 F.3d 733 (5th Cir. 2004).